# United States Court of Appeals

## For the First Circuit

No. 08-2550

FRANKLIN MEMORIAL HOSPITAL,

Plaintiff, Appellant,

v.

BRENDA M. HARVEY, in her official capacity as the Commissioner
of the Maine Department of Health and Human Services,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Ebel* and Lipez, Circuit Judges.

Marc N. Frenette with whom Michael R. Poulin and Skelton,
Taintor & Abbott were on brief for appellant.
Christopher C. Taub, Assistant Attorney General, with whom
Janet T. Mills, Attorney General, and Paul Stern, Deputy Attorney
General, were on brief for appellee.

August 5, 2009

---

\* Of the Tenth Circuit, sitting by designation.

**LYNCH, <u>Chief Judge</u>**.  Since 1989, Maine has required all hospitals to provide free medical services to certain low income patients under a set of statutes and regulations collectively known as "free care laws."  <u>See</u> Me. Rev. Stat. Ann. tit. 22, §§ 1715, 1716; 10-144-150 Me. Code R. § 1.01 et seq.  Maine's free care laws do not reimburse the hospitals for their expenses incurred in delivering care to low income patients, and the amount of free care that the hospitals must provide is not limited under the statute.

Separately, Maine pays for the medical treatment provided to some low income patients through its Medicaid program, called "MaineCare."  Yet the MaineCare reimbursements fall well below the hospitals' actual cost of providing medical services.

Plaintiff Franklin Memorial Hospital ("FMH") is a non-profit, general acute care hospital located in Farmington, Maine with a tradition of voluntarily providing free and reduced price medical care to low income patients.  FMH sued Brenda M. Harvey, the Maine official charged with enforcing the state's free care laws and administering MaineCare.  In a two-count complaint, FMH sought a declaratory judgment that both Maine's free care laws and MaineCare are unconstitutional takings of property.  The district court dismissed the count relating to MaineCare and granted summary judgment to the state official on FMH's takings challenge to the free care laws.  We affirm.

I.

Since July 1, 2007, Maine's free care laws have required hospitals to provide free medically necessary inpatient and outpatient hospital services to Maine residents who earn incomes at or below 150% of the federal poverty level.[1]  See 10-144-150 Me. Code R. §§ 1.01(A), 1.02(C).  Under the regulations, "[n]o hospital shall deny services to any Maine resident solely because of the inability of the individual to pay for those services."  Id. § 1.01(A).  Compliance with the free care laws is not a condition for having a license to operate a hospital in Maine.  Instead, the state obtains compliance with its free care requirement through a system of fines and enforcement suits brought by the state's attorney general or any affected patient.  See Me. Rev. Stat. Ann. tit. 22, § 1715(2).  Maine's free care laws do provide relief to

---

[1]  This is a change from Maine's prior free care scheme, which set the income qualification at 100% of the federal poverty level.

Historically, Maine law required local towns, not the medical care providers, to bear the cost of medical treatment for their indigent residents.  See Me. Rev. Stat. ch. 24, § 23 (1871) ("A person residing in a place not incorporated, may provide relief and medical aid for any person sick, wounded, or dangerously injured, residing in such place . . . and recover the amount necessarily expended of the town where such person had a settlement . . . ."); see also Hutchinson v. Inhabitants of Carthage, 73 A. 825 (1909) (ordering payment by the town for the cost of medical care rendered to an indigent family with measles).  In 1973, Maine's pauper laws were revised and replaced with a system of municipal general assistance programs, which required municipalities to pay the cost of certain medical expenses for their indigent residents.  See Me. Rev. Stat. Ann. tit. 22, §§ 4301, 4313.  These laws remain in effect today.

hospitals for which compliance with the regulations would have ruinous financial consequences. Specifically, in any legal action brought to enforce Maine's free care laws, the hospital may avoid liability by showing that its "economic viability . . . would be jeopardized by compliance." Id. § 1715(2)(D).

The parties agree that Maine's free care laws are unique in that

> (1) the laws mandate that a hospital provide free/uncompensated care to persons deemed eligible by the state through a penalty enforcement scheme, (2) the hospital is not reimbursed any amount for the provision of care, [and (3)] the provision of free care is not a license condition or is not linked to the state's certificate of need process.

To the parties knowledge, no other state has a system of free care with each of those three features.[2]

FMH operates in one of the poorest counties in Maine, and the amount of free medical services it provides in compliance with

---

[2] Other states, however, have laws that, although not identical to Maine's scheme, require hospitals to give free medical care to low income patients. Rhode Island, for example, requires "[a]ll licensed hospitals . . . as a condition of initial and/or continued licensure . . . [to] meet the statewide community needs for the provision of charitable care." R.I. Gen. Laws § 23-17.14-15(a). The Rhode Island regulations, in turn, state that "[h]ospitals shall provide full charity care (i.e., a 100% discount) to patients/guarantors whose annual income is up to and including 200% of the Federal Poverty Levels, taking into consideration family unit size." 14-90-28 R.I. Code R. § 11.3(c). Rhode Island's free care requirements are enforceable by the state's attorney general, and noncompliance may result in revocation of the hospital's license, up to a $1 million fine, and 5 years in prison. See R.I. Gen. Laws § 23-17.14-30.

Maine's free care laws has grown over the past several years. In 2004, FMH provided $131,280 in mandatory free care. During the eleven months preceding May 31, 2008, FMH spent $890,212 to meet its free care obligations.[3]

Still, these expenditures represent only a small fraction of FMH's overall budget. Indeed, the roughly $661,000 in mandatory free care that FMH provided during fiscal year 2007 amounted to only 0.51% of the hospital's gross revenues for that year, and FMH has not alleged that the level of free care that it currently provides threatens its continued economic viability.

Although Maine provides no payment for the medical services rendered in compliance with its free care laws, FMH recovers some of the costs it incurs in treating certain low income patients through reimbursements from the MaineCare program. Yet reimbursements through MaineCare fall well short of FMH's actual costs in treating patients. For example, in fiscal year 2007, FMH received reimbursement under MaineCare at a rate of $2646.95 per discharge for inpatient services, but FMH's actual cost per discharge had historically been approximately $4796. MaineCare's reimbursement rate for outpatient services is more favorable to FMH but still only covers 89.7% of the hospital's outpatient costs.

---

[3]     FMH has not received funds under the Hill-Burton Act, 42 U.S.C. § 291 et seq., and so is not subject to that statute's free care requirements.

On August 21, 2007, FMH sued Harvey in her capacity as the Commissioner of the Maine Department of Health and Human Services, seeking a declaratory judgment that both Maine's free care laws and the MaineCare program constitute uncompensated takings of property. On October 22, 2007, Harvey filed a motion to dismiss the count in FMH's complaint relating to the MaineCare program. The district court granted Harvey's motion to dismiss the MaineCare count on January 28, 2008, holding that FMH could not state a takings claim because it voluntarily participates in the MaineCare program. The parties filed cross-motions for summary judgment on the remaining count relating to Maine's free care laws. On September 24, 2008, a magistrate judge recommended granting Harvey's motion for summary judgment. The magistrate judge, applying an ad hoc analysis, held that Maine's free care laws did not constitute a regulatory taking. On November 14, 2008, the district court adopted the magistrate judge's recommended decision and granted Harvey's motion for summary judgment. FMH timely appealed.

## II.

We first address FMH's takings challenge to Maine's free care laws, which the district court rejected on summary judgment. We review the grant of a motion for summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party.

See Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

The Takings Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, prohibits the taking of private property for public use without just compensation. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536 (2005). Although physical occupation of a person's property is the paradigmatic taking, the Constitution also guards against certain uncompensated regulatory interferences with a property owner's interest in his property. Id. at 537. Here, the challenged government action, which does not directly appropriate FMH's property but rather regulates how FMH may use it, is properly analyzed under the law of regulatory takings, not the law of physical takings. See Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002) (en banc) ("A physical taking occurs either when there is a condemnation or a physical appropriation of property."); id. ("A regulatory taking transpires when some significant restriction is placed upon an owner's use of his property for which 'justice and fairness' require that compensation be given." (quoting Goldblatt v. Hempstead, 369 U.S. 590, 594 (1962))).

The Supreme Court's regulatory takings jurisprudence has eschewed bright-line rules. Indeed, in contrast to the law of physical takings, which typically "involves the straightforward application of per se rules," Tahoe-Sierra Pres. Council, Inc. v.

Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002), "regulatory takings jurisprudence . . . is characterized by 'essentially ad hoc, factual inquiries,'" id. (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978)), "designed to allow 'careful examination and weighing of all the relevant circumstances,'" id. (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)).

Still, the Supreme Court has identified "two categories of regulatory action that generally will be deemed per se takings." Lingle, 544 U.S. at 538. "First, where [the] government requires an owner to suffer a permanent physical invasion of her property -- however minor -- it must provide just compensation." Id. The Court cited, as an example, Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), where a "state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking." Lingle, 544 U.S. at 538. Second, the Court has held that per se regulatory takings occur where the "regulations completely deprive an owner of 'all economically beneficial us[e]' of her property." Id. (emphasis and alteration in original) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992)). Neither of these situations is presented here.

A.      Per Se Analysis

FMH argues that Maine's free care laws fall under the first category of per se takings because "FMH is required to admit

-8-

and house (and board) patients who need admission to a hospital for free." In its view, "[t]here is no difference in the government occupying a room or the government ordering that a room be made available to someone it designates." And FMH contends that "this case involves laws that force FMH to give its real property (hospital rooms) away for free."[4] Additionally, FMH stresses that Maine's free care laws require it to give away its personal property to the extent that it must purchase and freely provide expensive medicines and medical supplies to low income patients. Thus, in FMH's view, Maine's free care laws are not a form of price control but instead direct the transfer of property from the hospitals to low income patients.

The Supreme Court, however, has recognized that regulations of this sort do not effect a per se taking. See Yee v. City of Escondido, 503 U.S. 519, 527-28 (1992). Yee rejected a takings challenge to a rent control ordinance for mobile home parks. It held that the ordinance did not require the property owner to continue to use his land as a mobile home park and so did not infringe his right to exclude others from the property. Id. at 528. That is, because the property owner remained free to exclude

---

[4] Admittedly, this is not a permanent physical invasion of FMH's real property, but rather periodic and intermittent. But the temporary nature of the intrusion does not resolve the question of whether the free care laws violate the Constitution, for even temporary takings require just compensation. See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 318-19 (1987).

others from his property if he ceased using his property as a mobile home park, the Supreme Court found that ordinance did not <u>require</u> the occupation of the property by unwanted tenants. Here too, FMH is not required to serve low income patients; it may choose to stop using its property as a hospital, which is what makes it subject to Maine's free care laws.

Moreover, the second category of per se taking is not presented on these facts. There is no allegation that the regulations remove <u>all</u> economically beneficial uses of the property; FMH merely says that it faces higher operating costs as a result of the free care laws.

B.      <u>Ad Hoc Analysis</u>

Because the challenged government action does not fall under either category of regulatory taking invoking a per se rule, we apply an ad hoc analysis. Our analysis is guided by the three <u>Penn Central</u> factors: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action."[5]  438 U.S. at 124. "[T]he <u>Penn Central</u> inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact

---

[5]     We are bound by the <u>Penn Central</u> factors but note that the <u>Penn Central</u> analysis has been the subject of some academic criticism. <u>See,</u> <u>e.g.</u>, R.A. Epstein, <u>From Penn Central to Lingle: The Long Backwards Road</u>, 40 J. Marshall L. Rev. 602 (2007).

and the degree to which it interferes with legitimate property interests." Lingle, 544 U.S. at 540. Ultimately, this inquiry "aims to identify regulatory actions that are functionally equivalent to the classic taking in which the government directly appropriates private property or ousts the owner from his domain." Id. at 539.

1.      Economic Impact of the Regulations

In response to those three factors, FMH argues that the economic impact of the regulations is severe because "[t]he amount of goods and services being confiscated by the State under the Free Care Laws [is] significant and potentially unlimited." And the cost of providing medical care is undisputably high. According to FMH, each inpatient on average requires "approximately $1,200 in medical goods, such as medical and surgical supplies, pharmacy drugs, anesthesia gases, and intravenous therapy supplies, about $1,700 in room and board services, and . . . about $1,800 for doctors, nurses, and other staff to provide care to the client." Moreover, the financial burden on FMH under Maine's free care laws has increased nearly five fold since 2006 under the new regulations.

Yet the potentially harsh economic consequences to hospitals of Maine's free care laws are ameliorated somewhat by the statutory defense to enforcement of the free care requirements against hospitals whose "economic viability . . . would be

jeopardized by compliance." Me. Rev. Stat. Ann. tit. 22, § 1715(2)(D). And there is no allegation that FMH is presently facing any threat to its economic viability on account of the free care laws.[6] We do not suggest that there can never be a taking based upon an adverse economic effect short of jeopardizing the economic viability of a plaintiff; we only note that this case is not at that end of the spectrum.

We do agree with one of FMH's arguments regarding how to assess the economic impact of the regulation. The magistrate judge's recommended decision speculated that "[i]t is not difficult to imagine, for example, that Franklin Memorial's revenue from other public programs, or better yet, the profits from such programs, exceeds the financial burden imposed by Maine's Free Care Laws." This factor is not relevant to the question of whether Maine's free care laws constitute a taking and plays no part in our analysis.

2.     Effect on FMH's Investment-Backed Expectations

As for FMH's investment-backed expectations, we first reject an argument made by the defendant. Harvey argues the hospital's non-profit status eliminates any influence this factor

---

[6]     Our case does not involve a hospital whose claim that its economic viability would be jeopardized by compliance with the free care laws has been rejected by state authorities.

has in FMH's favor.[7]  We disagree very much with Harvey's proposed categorical approach.  While there may be differences in degree between expectations for for-profit institutions and non-profit institutions, there is no categorical exclusion of non-profit institutions from this prong of the analysis.  Like a for-profit institution, FMH acquires property with the expectation that it may use it for a particular purpose.  Indeed, Maine law expressly recognizes the right of non-profit corporations to acquire, own, use, improve, and convey property like any other property owner.[8]  See Me. Rev. Stat. Ann. tit. 13-B, § 202(1)(I).  To the extent that Maine's free care laws may force FMH to use its property in ways that it would not otherwise, they may interfere with FMH's investment-backed expectations.

---

[7]    Harvey also argues that we should adopt a new test for charitable organizations, which finds a taking only where the regulation interferes with the organization's charitable purpose. We reject Harvey's invitation to adopt such a standard and adhere to the usual regulatory takings analysis under Penn Central.

[8]    Maine law does not forbid a non-profit entity from earning a return on its investment.  It merely restricts how non-profits may dispose of any profits they earn.  For example, a non-profit may not pay dividends or distribute its profits to its members, directors, or officers.  See Me. Rev. Stat. Ann. tit. 13-B, § 407.  And upon dissolution or liquidation of a non-profit, the entity's assets must go to an organization involved in "substantially similar" activities.  Id.
    Moreover, as a non-profit hospital, FMH is considered a "public charity," subject to additional regulations.  See Me. Rev. Stat. Ann. tit. 5, § 194-A(2) ("Any nonprofit hospital and medical service organization is a charitable and benevolent institution and a public charity and its assets are held for the purpose of fulfilling the charitable purposes of the organization.").

It is true that FMH's investment-backed expectations are tempered by the fact that it operates in the highly regulated hospital industry.[9] See United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Mem'l Hosp., 995 F.2d 1179, 1191 (3d Cir. 1993) (rejecting a takings challenge to New Jersey's system of setting hospital billing rates, in part, because the plaintiffs' investment-backed expectations were reduced by "the historically heavy and constant regulation of health care" in the state).  And the Supreme Court has recognized that heavy government regulation may diminish a property owner's expectations.  See Lucas, 505 U.S. at 1027-28 ("It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers . . . .  And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the

---

[9]     Despite the second and third prongs of the ad hoc test, it is also true that the extent to which Maine's free care laws "substantially advance legitimate state interests," Agins v. City of Tiburon, 447 U.S. 255, 260 (1980), abrogated by Lingle, 544 U.S. at 541-42, plays no part in our analysis.  As Lingle recognized, this factor sounds in due process, 544 U.S. at 542, and although there is some overlap between the protections of substantive due process and the law of takings, see Goldblatt, 369 U.S. at 594 (recognizing, in the context of a due process challenge, that a regulation may be "so onerous to as to constitute a taking which constitutionally requires compensation"), consideration of whether a regulation substantially advances a legitimate state interest "is not a valid method of discerning whether private property has been 'taken' for purposes of the Fifth Amendment," Lingle, 544 U.S. at 542.  FMH has not raised a due process challenge.

possibility that new regulations might even render his property economically worthless . . . .").

### 3. The Character of the Government Action

The third Penn Central factor -- the character of the government action -- strongly favors finding no taking here. Under Penn Central, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citation omitted). Thus, in Hodel v. Irving, 481 U.S. 704, 716 (1987), the Supreme Court found a taking where the character of the government regulation was "extraordinary" in that it completely extinguished the property owner's right to pass on the property to his heirs. By contrast, the free care laws adjust the benefits and burdens of economic life but leave the core rights of property ownership intact. Maine's free care laws merely require that hospitals not refuse to treat patients based on their ability to pay and that they provide those services freely to those with incomes at or below 150% of the federal poverty level. FMH may otherwise set the terms on which it provides access to its facilities and services. Thus, on these facts, we hold that Maine's free care laws do not effect a taking.

III.

FMH separately challenges the reimbursement rate it receives under the MaineCare program as an unconstitutional taking. The district court dismissed this count, and we review de novo the grant of a motion to dismiss, assuming the truth of all well-pleaded facts in the complaint and drawing all reasonable inferences in FMH's favor. Vernet v. Serrano-Torres, 566 F.3d 254, 258 (1st Cir. 2009).

Of course, where a property owner voluntarily participates in a regulated program, there can be no unconstitutional taking. See Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir. 1993) ("[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking."); cf. Yee, 503 U.S. at 527-28 (finding no taking because the property owner voluntarily engaged in the regulated conduct). FMH's essential argument is that it has no choice but to participate in MaineCare because otherwise it would be forced to treat low income patients without any compensation at all under the state's free care laws.

Under the Maine free care laws, an individual who has insurance or is eligible for coverage by a state or federal medical assistance program, like MaineCare, is generally not eligible to receive free care. See 10-144-150 Me. Code R. § 1.05(B)(1)(b).

But there is an exception to this rule: if a patient meets the income requirements to receive free care but has insurance or is eligible for state or federal medical assistance, the hospital must treat the patient and "any amount remaining due after payment by the insurer or medical assistance program will be considered free care." Id. § 1.05(B)(2). That is, the treating hospital bears the medical costs for treating low income patients beyond what is covered by insurance or a government-funded medical assistance plan.

FMH reads the regulation, 10-144-150 Me. Code R. § 1.05(B), to require that if a hospital opts out of MaineCare, it must pay the entire cost of treating patients who are eligible for MaineCare. Thus, in FMH's view, hospitals must choose between receiving inadequate reimbursement by participating in MaineCare or receiving no reimbursement at all.

Harvey, however, offers a different reading. She argues that the regulation's use of the phrase "any amount remaining due after payment by the insurer or medical assistance program" really means "any amount not covered by insurance or medical assistance program." Under this reading, if a hospital did not accept coverage from a particular insurer or government program, it could still obtain compensation by billing the patient directly for up to the amount that would be covered by the insurer or medical assistance program. Harvey defends this reading because the

-17-

regulation's drafters worked from "the assumption that the hospital participates in, and would receive some payment from, the insurer or medical assistance program."  Harvey says this assumption is reasonable because, to the state's knowledge, every hospital in Maine participates in MaineCare.

We owe some deference to an agency's reasonable interpretations of its own regulations.  See Massachusetts v. United States, 522 F.3d 115, 127 (1st Cir. 2008) ("This court must also be mindful of the substantial deference required when an agency adopts reasonable interpretations of regulations of its own creation.").  Yet our level of deference is reduced to the extent that the agency's interpretation is merely a litigation position. See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army, 398 F.3d 105, 112 n.5 (1st Cir. 2005).

Regardless of the level of deference we give Harvery's interpretation, we accept it as reasonable.  Indeed, we view it as a judicial admission, which will have some binding effect on the state.[10]  See Massachusetts, 522 F.3d at 118 (binding the Nuclear Regulatory Commission to its litigation position).  Allowing hospitals that opt out of MaineCare to seek compensation for the medical services they provide advances the state's broader goal of making health care widely accessible.  And reading "payment" as

---

[10]     Nothing in this opinion precludes defendant from moving to revise the literal language of the regulation to make it conform with the position taken in court.

synonymous with "coverage" is sensible given the background understanding that all Maine hospitals participate in MaineCare.

Accepting Harvey's reading of the regulation, there is no coercive financial incentive to participate in MaineCare. Hospitals are not left with accepting MaineCare's reimbursement rates to avoid receiving nothing at all. Therefore, we hold that FMH's participation in MaineCare is voluntary and reject its takings challenge on that basis.

IV.

In the end, FMH's objection to Maine's free care laws and MaineCare program is a dispute with the policy choices made by the state's political branches. As such, FMH's better course of action is to seek redress through the state's political process.

The district court's judgment is affirmed.