Fabricant, Judith, J.
*106 INTRODUCTION
This action challenges decisions of the Secretary of the Executive Office of Health and Human Services setting reimbursement rates under the Massachusetts Medicaid program, known as MassHealth, for services provided by Boston Medical Center and its managed care affiliate, Boston Medical Center Health Plan. Before the Court is the Secretary’s motion for judgment on the pleadings or, in the alternative, for partial summary judgment. The central argument underlying the motion for judgment on the pleadings is that neither state nor federal law authorizes judicial review of the rates set by the Secretary. The Court agrees, and accordingly will order the complaint dismissed. The Court will not reach the alternative request for partial summary judgment.
BACKGROUND[1]
States operate Medicaid programs under plans approved by federal authorities pursuant to federal statutory and regulatory standards. Among the governing provisions of federal law is 42 U.S.C. §1396(a)(30)(A), which requires that each state plan:
provide such methods and procedures relating to . . . the payment for care and services ... as may be necessary to . . . ensure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available ... at least to the extent that such care and services are available to the general population in the geographic area . . .
Chapters 118E and 118G of the General Laws govern the Massachusetts Medicaid program, known as MassHealth. Section 1 of c. 118E vests responsibility for administration of the program in the Secretary of the Executive Office for Health and Human Services. Section 36 of c. 118E provides that participation in MassHealth “shall be limited to providers of services who . . . indicate their intention ... to so participate . . . [and] agree to accept, as payment in full, the amounts paid in accordance with the fee schedules' provided in this chapter." Chapter 118G, §2A, confers on the Secretary “sole responsibility for establishing rates of payment” for services provided under MassH-ealth, and directs the Secretary to set rates that shall be “adequate to meet the costs incurred by efficiently and economically operated facilities,” and “within the financial capacity of the commonwealth.” Section 11 governs the setting of rates for acute and non-acute hospitals. It directs that such rates “shall be established by contract. . . [e]xcept as provided in subsections (a) and (b).” Subsection (a) provides that “[f]or disproportionate share hospitals,[2] the executive office shall establish rates that equal the financial requirements[3] of providing care to recipients of medical assistance.”[4]
Pursuant to the mandate of c. 118G, §11, the secretary sets rates for each acute hospital by issuing an annual Request for Applications (REA). Each RFA describes the methodology for setting rates for that year, and specifies that hospitals submitting applications thereby agree to accept the rates set based on the methodology set forth in the RFA “as payment in full.” Each hospital responds to the RFA by submitting an application and executing a form contract, in which the hospital agrees to provide services at the rates set by EOHHS. The contract provides that EOHHS may amend rates “as it determines necessary.” A hospital may respond to a notification of amendment by returning an executed amendment, terminating its participation in MassHealth, or requesting correction of any error in calculation. If the hospital does not respond to an amendment in one of those ways, EOHHS “may exercise its discretion either to terminate for cause (upon 30 days prior written notice) or continue the Contractor’s participation.”
Among the components of each hospital’s rate is the so-called Standard Payment Amount Per Discharge, or SPAD. This is a hospital-specific amount paid for the first twenty days of service to each MassHealth in-patient who is not enrolled in a managed care plan. Each RFA describes the methodology for calculating the SPAD rate. EOHHS’s method for calculating SPAD rates, as set forth in each RFA, begins with a statewide average payment amount per discharge, which EOHHS then adjusts for each hospital based on factors including case-mix and geographic and hospital-specific cost differences, subject to a limit based on a so-called “efficiency standard.” EOHHS sets the efficiency standard at a specified percentile of all MassH-ealth discharges statewide for a given period. The efficiency standard was 75% from the early 1990s through 2006. EOHHS raised the efficiency standard to 90% for 2007 and 2008, but then, by an amendment effective December 7, 2008, lowered it back to 75% for 2009.
Plaintiff Boston Medical Center Corporation (BMC) is the non-profit corporation that operates Boston Medical Center. Boston Medical Center was established by the City of Boston, pursuant to statutory authorization granted in the Boston Public Health Act of 1995, St. 1995, c. 146 (the BPH Act), as a result of the merger of the former Boston City Hospital and the former Boston University Medical Center. Section 1(a) of the BPH Act declared “that the city should be empowered to provide for the establishment of a new medical center,” which would have as its “mission . . . to consistently provide excellent and accessible health care services to all in need of care, regardless of status or ability to pay... play an important role as a referral, tertiary level hospital serving the region in a financially responsible manner and continue to serve the most acutely ill patient populations.” Section 1 (b) proceeded to set forth “six equally important guiding principles” to which “the new medical center shall commit itself.” Among these was “ensuring the availability of a full range of primary through tertiary medical programs,” *107 “serving both urban and suburban communities in a culturally and linguistically competent manner,” “enhancing its role as a major academic medical center,” and “participating effectively and competitively in managed care plans serving the patient population.”
Section 5 of the BPH Act empowered the city to execute an agreement providing for the merger of the former Boston City Hospital with the former Boston University Medical Center, “providing that the corporation resulting from such merger . . . accepts as its mission the statement of policy set forth in paragraph (b) of section one, and agrees with the city to utilize the acute-care hospitals and other health care facilities under its custody and control ... to provide a single standard of health care to all in need of care, including vulnerable populations within the city, with equal access regardless of status or ability to pay.” Section 5(f) of the BPH Act provided that “the hospital resulting from such merger . . . shall be deemed to retain the status which Boston City Hospital had . . . as a public service hospital” for purposes of specified regulations then in effect, and of eligibility for payments pursuant to specified statutes and regulations then in effect, including “payments to high public payer hospitals,” “disproportionate share adjustments for safely net providers,” payments “from the uncompensated care pool,” and “payment from and participation in medical assistance programs ... on a basis which recognizes such resulting hospital as the successor to Boston City Hospital,” all pursuant to specified statutes and regulations then in effect.
Boston Medical Center became a participant in MassHealth by executing a written provider agreement in 1996. That agreement provides in paragraph 1.1 that it “shall continue in effect until terminated by either party upon written notice to the other party.”[5] Under that agreement, BMC agreed to furnish services conforming to applicable regulations, for which the Commonwealth agreed, at paragraph III. 1 “to reimburse the Provider at rates set by the Massachusetts Rate Setting Commission.”[6] BMC has submitted annual applications in response to the annual RFAs issued by EOHHS.
For 2009, the RFA as amended reduced BMC’s SPAD rate from the 2008 rate of $12,476.27 to $9,323.43. The complaint alleges that the RFA also departed from previous practice (and, BMC contends, from statutory requirements) by failing to include an adjustment for BMC’s status as a disproportionate share hospital; for 2008, that adjustment for BMC amounted to $6,300,000. BMC did not return a signed RFA to EOHHS for 2009, but it also did not terminate its participation in MassHealth, nor did EOHHS terminate it. BMC has continued to serve MassHealth patients, and to receive reimbursement as set under the RFA, as amended. The complaint alleges that the overall effect on it of the changes in the RFA for 2009 is “at least $36,300,000 per year,” and that, overall, the Commonwealth pays BMC “64 cents for each dollar it incurs to provide care to safety net patients.”
BMC is the state’s largest provider of care to low income patients, referred to as “safety-net" patients. Such patients constitute 51% of BMC’s patient population; privately-insured patients constitute only 19%. The complaint alleges that BMC receives “either partial reimbursement or no reimbursement for its cost” of providing services to safety-net patients. Because the costs of serving such patients are greater than the costs of serving more affluent patients, the complaint alleges, “BMC cannot rely upon its efficient operation or subsidies from private payers to offset inadequate government rates for its ongoing operation.”
Plaintiff Boston Medical Center Health Plan, Inc. is a managed care organization (MCO) affiliated with BMC. BMCHP entered into a Medicaid managed care organization agreement (known as an MCO Contract) with EOHHS in 1997. Under the MCO contract BMCHP receives reimbursement for services provided to MassHealth patients on a capitation basis—that is, it receives a fixed monthly amount for each member. EOHHS sets the capitation rate by contract each year. In addition, under a series of special acts of the legislature between 1997 and 2005, BMCHP and one other managed care organization, Cambridge Health Alliance (CHA), received certain supplemental payments. See St. 1997, c. 88, §73; St. 2005, c. 45, §16.[7]
In 2006, the legislature enacted the health reform act, St. 2006, c. 58. See Provencal v. Commonwealth Health Ins. Connector Auth., 456 Mass. 506, 507-08 (2010). Among other changes, the new law eliminated what was formerly known as the uncompensated care pool, through which hospitals and health centers had received payments for services to uninsured patients eligible for free care. See St. 2006, c. 58, §§30, 132; G.L.c. 118G, §§34-39, 43. The supplemental payments previously made to BMCHP and CHA ceased after 2006. However, the health reform act included the following, at §122.
Notwithstanding any general or special law to the contrary, during fiscal years 2007,2008, and 2009, the executive office of health and human services shall reimburse certain publicly operated or public-service hospital entities operated by the Cambridge Health Alliance and the Boston Medical Center Corporation ... at levels consistent with net supplemental payments of $287,000,000 in fiscal year 2006 . . . For fiscal year 2009, subject to appropriation, the executive office shall hold harmless said amount of $287,000,000 in funding by allocating $160,000,000 in net supplemental payments from the Commonwealth Care Trust Fund and by increasing actuarially sound rates to the maximum extent allowable and eligible for financial participation, including the balance from other financing mechanisms, such as direct supplemental payments for certain publicly operated or public service *108 hospital entities operated by the Cambridge public health commission and the Boston Medical Center Corporation.[8]
The legislature appropriated funds to the Secretary for the operation of MassHealth in each year, including in each appropriation act a directive that “no rate increase shall be provided . . . without taking all measures possible” under federal law “to ensure that rates of payment to providers do not exceed the rates that are necessary to meet only those costs which must be incurred by efficiently and economically operated providers.” E.g. St. 2008, c. 182, §88(b), item 4000-0300.
The complaint alleges that BMC was entitled to a total of $191,300,000 for 2009, under §122, and that that amount was “intended to be paid in two basic categories,” $106,600,000 as “net supplemental payments from the Commonwealth Care Trust Fund,” and $84,600,000 to BMCHP “through an increase in actu-arially sound rates to the maximum extent allowable and eligible for federal financial participation ... or, if necessary, to BMC by other financing mechanisms.”[9] The Secretary paid BMC $106,000,000 in net supplemental payments, but, the complaint alleges, did not pay the remaining $84,600,000.
EOHHS notified BMCHP of its capitation rates for 2009 in August of 2008. The rates set, according to the complaint, were based on data from 2005 and 2006 without an upward adjustment, and, the complaint alleges, did not increase rates “to the maximum extent allowable and eligible.” BMCHP protested in letters to EOHHS. On October 22, 2008, EOHHS notified BMCHP of an amendment to its MCO, the effect of which was to reduce its rates by, according to the complaint, approximately $15.5 million. On or about November 10, 2008, BMCHP executed and returned the contract amendment, but submitted with it a document labeled “Reservation of Rights,” in which it asserted objections to the revised rates on a number of grounds, including its contention that the new rates would not comply with §122. Stating that BMCHP signed the amendment under duress, the document, purported to reserve “any right that it may have ... to challenge the rates.” The complaint alleges that BMCHP executed the amendment “because failure to do so would have resulted in EOHHS’s immediate transfer of enrollees out of BMCHP, which would have caused major disruption of care to those members.”
The Secretary responded to BMHCP’s “Reservation of Rights,” in a letter dated November 13, 2008, signed by the Medicaid Director. The letter asserted EOHHS’s position that the reservation of rights “operates only to express concerns, and is not part of the Contract, does not operate to modify the terms of the Contract, and does not create any rights not otherwise explicitly available to BMCHP under federal or state law or regulation.” Accordingly, the letter went on, EOHHS did not construe the reservation of rights as a rejection of or counter-offer to the amendment. If, however, BMCHP “did not intend to accept the Amendment unconditionally, including all payment terms as payment in full, and would prefer instead not to renew the MCO contract,” the letter instructed it to so notify EOHHS, in which event the contract provisions for termination would take effect. The complaint does not allege that BMCHP has so notified EOHHS.
BMC and BMCHP brought this action on July 15, 2009, and filed an amended complaint on October 19, 2009. The amended complaint alleges that, overall, EOHHS owes BMC and BMCHP a total of $120,900,000, plus interest, for 2009. The amended complaint asserts seven counts: breach of contract, on behalf of BMC only (count I); violation of statutes, on behalf of both BMC and BMCHP (count II); quantum meruit, on behalf of both (count III); taking without lawful compensation, on behalf of BMC only (count IV); declaratory judgment and mandamus, on behalf of both (count V); review in the nature of certiorari, on behalf of both (count VI); and preemption under the supremacy clause, on behalf of BMC only. The prayer for relief, applicable to all counts, seeks judgment for BMC and BMCHP and against EOHHS for damages and interest under Counts I through IV," along with a declaration that the rates set and the methodology applied are arbitrary, capricious, unreasonable, an abuse of discretion, and in violation of law, in various respects stated.
DISCUSSION
A motion for judgment on the pleadings challenges the legal sufficiency of the complaint, and accordingly, is subject to the same standards as a motion to dismiss. Welch v. Sudbury Youth Soccer Ass’n, Inc., 453 Mass. 352, 353 (2009). Taking all factual allegations of the complaint as true, but disregarding legal conclusions, see General Convention of New Jerusalem v. MacKenzie, 449 Mass. 832, 838 (2007), the Court must determine whether the complaint sets forth allegations “plausibly suggesting (not merely consistent with) an entitlement to relief.” Iannaccino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (internal quotations and citation omitted). The Court considers the counts of the complaint based on that standard.
1. Counts I and II Breach of Contract and Violation of Statutes.
Count I identifies the contract alleged to have been breached, in paragraph 88, as “the reimbursement requirements provided for by state statute.” Count II identifies the statutes alleged to have been violated as G.L.c. 118G, §11(a); St. 2006, c. 58, §122; and St. 2008, c. 182, §88(b).[10] The Secretary seeks dismissal of both these counts on the grounds, among others, that they are barred by the Commonwealth’s sovereign immunity, and that the statutes in issue neither establish a contract nor give rise to a direct right of action for their violation.
“Sovereign immunity bars a private action against a State in its own courts absent consent by the Legis *109 lature or abrogation of sovereignty by Congress acting under its Fourteenth Amendment powers . . . Consent to suit must be expressed by the terms of a statute, or appear by necessary implication from them. When that consent is granted, the Commonwealth can be im-pleaded only in the manner and to the extent expressed in the statute.” Lopes v. Commonwealth, 442 Mass. 170, 175-6 (2004) (internal quotations and citations omitted). “A contractual claim does not arise under a statute unless the Legislature has explicitly expressed the intent to waive sovereign immunity and create a contractual remedy.” Id, at 178. “For a contract to arise from astatute there must be a clear intention of the Legislature that a statute be so interpreted.” Milton v. Commonwealth, 416 Mass. 471, 475 (1993). “[A] clear legislative intent is necessary to infer a private cause of action from a statute.” Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court 448 Mass. 15, 38 (2006), quoting Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 543 (1998); see Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 373 (2008).
None of the statutes on which BMC relies expresses any intent either to waive sovereign immunity or to create a cause of action, in contract or otherwise. Indeed, none makes any reference to any suit by a provider of services under MassHealth against the Commonwealth, or to any judicial remedy for claimed violation.[11] To the contrary, the statutory scheme, as described, supra, makes clear that providers participate in MassHealth pursuant to express written contracts, under which they agree to accept the rates set by EOHHS as full payment for services. A breach of obligations under those express contracts would give rise to a right to sue, but BMC does not allege any such breach.
BMC cites Todino v. Wellfleet, 448 Mass. 234, 238 (2007); and Bates v. Dir. of Office of Campaign & Political Fin., 436 Mass. 144, 173-74 (2002). Neither involved the statutes in issue here, or any other statute relating to rate setting or any comparable administrative action. Todino involved G.L.c. 41, §111F, which grants certain injured municipal employees the right to leave “without loss of pay,” and directs that payments be made “at the same times and in the same manner as . . . regular compensation.” The issue before the Court was not whether the plaintiff had a judicial remedy to enforce her right to the pay specified under that statute, but whether the waiver of sovereign immunity granted by the statute extended to payment of interest. The Court held that it did, by necessary implication, because without interest to compensate for delay in payment, the plaintiff would lose part of the value of the pay that the statute guaranteed her. 448 Mass. at 237-39.
Bates involved the Clean Elections Law, enacted by the voters through an initiative petition, which directed the legislature to appropriate funds to be granted to candidates for office who would abide by certain requirements, and who received certification of eligibility by the director of the Office of Campaign and Political Finance. In that unusual circumstance, the Court construed the statute as waiving sovereign immunity “by necessary implication,” so as to effectuate the will of the voters who enacted it directly. 436 Mass. at 173.[12] The Court emphasized that “[o]ur holding is a narrow one. The Commonwealth’s liability arises from the affirmative acts of an authorized official of the Commonwealth, the director, in certifying” the individual as a. clean elections candidate, “and from the inextricable relationship established by the statute between clean elections certification and clean elections funding.” Id. at 175.
The essential teaching of these decisions is that the question of whether a statute waives sovereign immunity and gives rise to a cause of action against the Commonwealth is one of statutory construction. The Court must look to the language and purpose of the statute, in the context of the overall statutory scheme. Here, the statutory scheme assigns to the Secretary responsibility to set rates for MassHealth by entering into contracts with providers who choose to participate, and who agree to accept the rates set as payment in full.[13] It directs the Secretary to set rates in accord with various goals and objectives, some of which are in tension with one another. Some of the statutory provisions employ broad, general terms (economy, efficiency, access, quality, reasonable costs, etc.), while others (most particularly the hold harmless language of §122) are more directive and specific. The Secretary’s performance of the task assigned to her necessarily calls for the application of technical expertise that the Court lacks, and the exercise of judgment and discretion that the legislature has not entrusted to the Court. See Hingham Healthcare Limited Partnership v. Division of Health Care Finance and Policy, 439 Mass. 643, 648 (2003) (application of statutory factor in setting Medicaid rates “lies in the discretion” of designated agency). The Court concludes that implication of a waiver of sovereign immunity, and the grant of a cause of action, in these statutes would not serve the legislative purposes. Accordingly, the Court will dismiss counts I and II.
2. Count III Quantum Meruit.
Count III alleges that BMC and BMCHP conferred a benefit on the Commonwealth by providing medical coverage and services to MassHealth enrollees, with the reasonable expectation of receiving compensation for the value of those services, and that EOHHS has refused to pay for such value; on that basis, the plaintiffs seek recovery on a theory of quantum meruit. Such relief, however, is not available “where an express contract covering the matter exists.” York v. Zurich Scudder Investments, Inc., 66 Mass.App.Ct. 610, 620 (2006), and cases cited; see Machado v. Committee for Pub. Counsel Servs., 39 Mass.App.Ct. 178, 183 (1995). Here, as the background recited, supra, indicates, each of the plaintiffs was a party to an express contract with EOHHS, in which it agreed *110 to accept the rates set as payment in full. It follows that neither has a remedy in quantum meruit
Neither BMC’s failure to sign the RFA, nor BMCHP’s reservation of rights, undermines that conclusion. Each had executed a provider agreement that remained in effect absent termination, and each provided services with full notice of the rates at which it would receive reimbursement. Such performance would create a contract in itself. See Haufler v. Zotos, 446 Mass. 489, 499 (2006), and cases cited. Nor does BMCHP’s claim of duress enable it to seek higher reimbursement than provided by the contract it signed and performed. Even if its factual allegations amounted to duress, a point on which the Court is at least skeptical, that would make the contract voidable, not void.[14] See Cabot Corp. v. AVX Corp., 448 Mass. 629, 637 (2007). BMCHP did not seek to void the contract; to the contrary, the facts it alleges establish that it performed and accepted reimbursement under it. In doing so, it ratified the contract, including the rates set in it. See Cabot, supra, 448 Mass. at 642-46 (party claiming duress must “disclaim the contract.. . promptly or be held to have forfeited his right to do so”). Count III must therefore be dismissed.
3.Count IV Confiscation.
Count IV alleges that BMC “has a statutory mandate to consistently provide accessible health care services to all in need of care, regardless of status or ability to pay,” and “is required to participate in MassHealth to fulfill its statutory mission”; that the rates set by EOHHS “interfere with BMC’s reasonable expectations” and “represent a sudden, unpredictable and marked departure from its historical practices to BMC’s detriment,” and that EOHHS’s actions “are confiscatory and deprive BMC of its property without just compensation.” The First Circuit rejected a virtually identical claim in Franklin Memorial Hospital v. Harvey, 575 F.3d 121, 129-30 (1st Cir. 2009), on the ground that “where a property owner voluntarily participates in a regulated program, there can be no unconstitutional taking.” Id. at 129. See also Minnesota Ass’n of Health Care Facilities, Inc. v. Minnesota Depart. of Pub. Welfare, 742 F.2d 442, 445-47 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985); Massachusetts State Pharmaceutical Ass’n v. Rate Setting Comm’n, 387 Mass. 122, 136 n. 13 (1982) (“substantial question” whether Medicaid provider “has any constitutional claim that a rate of reimbursement is confiscatory,” where “participation in the Medicaid program is voluntary”).
Providers’ participation in MassHealth is voluntary as a matter of law. G.L.c. 118E, §36; Hennessey v. Berger, 403 Mass. 648, 650-51 (1988). BMC contends that it is an exception to this general rule, because the Boston Public Health Act confers on it a mission that, as a practical matter, it cannot fulfill without participation in MassHealth. That act, as described supra, does not require BMC to participate in MassHealth. Indeed, it does not impose any requirement directly on BMC. Rather, it authorizes the City of Boston to establish a hospital that would accept a multi-faceted mission, which would include providing “services to all in need of care, regardless of status or ability to pay.” As a matter of law, BMC is free to pursue that mission in whatever manner and by whatever means it chooses. Of course, economic realities limit its options as a practical matter. But economic pressures are not the same as legal compulsion, which is necessary to support a claim of unconstitutional taking. See Garelick v. Sullivan, 987 F.2d 913, 917-18 (2d Cir.), cert. denied, 510 U.S. 821 (1993) (“A property owner must be legally compelled to engage in price-regulated activity for regulations to give rise to a taking”); Minnesota Ass’n of Health Care Facilities, Inc. v. Minnesota Depart. of Pub. Welfare, 742 F.2d at 446 (participation is voluntary despite “business realities” and “strong financial inducement”). Count IV therefore must be dismissed.
4. Count V Mandamus.
Count V alleges that EOHHS’s actions “are in the nature of final actions and no other adequate or effective remedies are available to the plaintiffs.” It seeks an order pursuant to G.L.c. 249, §5, “requiring EOHHS to perform clear cut duties which EOHHS has a legal duty to perform”—that is, to make payments in the amounts claimed.[15] “(MJandamus is a remedy for [administrative] inaction and [is] not available where action has already been taken.” Doherty v. Retirement Bd. of Medford, 425 Mass. 130, 134 (1997), quoting Rines v. Justices of Superior Court 330 Mass. 368, 373 (1953) (bracketed insertions in original). Nor does mandamus lie “to obtain review of the decision of public officers who have acted and to command them to act in a new and different manner,” Harding v. Commissioner of Ins., 352 Mass. 478, 480 (1967), or to compel a public official “to exercise his or her judgment or discretion in a particular way.” Urban Transport Inc. v. Mayor of Boston, 373 Mass. 693, 698 (1997). Here, the Secretary’s statutory duty is to set rates of reimbursement for services provided under MassHealth by entering into contracts with providers who agree to accept the rates set. The Secretary has done exactly that. Mandamus does not provide a vehicle for judicial review of the rates set by the Secretary, even in the face of an argument that those rates fail to meet statutory standards. Count V must be dismissed.
5. Count VI Certiorari.
Count VI seeks review in the nature of certiorari of the rates set by EOHHS “to the extent that no other review is available.” General Laws c. 249, §4, authorizes judicial review in the nature of certiorari,
for correction of substantial errors of law apparent on the record created before a judicial or quasi-judicial tribunal. To obtain certiorari review of an administrative decision, one must show (1) a judicial or quasi-judicial proceeding; (2) a lack of all other reasonably adequate remedies; and (3) a substantial injury or injustice arising from the proceeding under review. If the proceeding or hearing involves unsworn state- *111 merits by interested persons advocating or disapproving the proposed new policy rather than sworn testimony by witnesses subject to cross-examination in a hearing preceded by specific charges, the hearing is more likely to be legislative or regulatory, rather than quasi-judicial, in nature. Further, if a hearing is not preceded by specific charges and is not followed by the adoption of formal findings of fact, it is more likely to be regulatoiy in nature.
School Committee of Hudson v. Board of Educ., 448 Mass. 565, 576 (2007) (internal quotations and citations omitted). The rate-setting process in issue here bore none of these indicia of judicial or quasi-judicial decision-making. The Secretary did not, and was not required to, conduct a hearing or make findings of any kind. Rather, pursuant to the statutory directive of G.L.c. 118G, §11, she entered into contracts with BMC and BMCHP for services to be provided at specified rates of reimbursement. Certiorari review does not lie.[16]
6. Count VII Preemption Under the Supremacy Clause.
Count VII asserts that “EOHHS’s improper rate-setting process and unlawful refusal to make payments to BMC are contrary to the requirements of 42 U.S.C. § 1396(a) (30) (A) because EOHHS did not consider whether its payments to BMC are consistent with efficiency, economy, quality of care, and access to care,” and that the rates “are thus preempted under the Supremacy Clause of the United States Constitution, Art. IV.” Case law has unequivocally established that the Medicaid Act does not abrogate the immunity of the states under the eleventh amendment to the United States constitution, and does not provide a private right of action. Florida Dept. of Health & Rehab. Sucs. v. Florida Nursing Home Ass’n, 450 U.S. 147, 150 (1981) (Medicaid Act does not abrogate eleventh amendment); Long-Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 50, 58-59 (1st Cir. 2004) (no private right of action to enforce 42 U.S.C. §1396(a)(30)(A)), applying holding of Gonzaga University v. Doe, 536 U.S. 273, 283 (2002) (no private cause of action exists unless statute “displays an intent to create not just a private right but also a private remedy”). Plaintiffs nevertheless contend that they can challenge the rates set by the Secretary directly under the supremacy clause. The Court is not convinced.
The absence of a private right of action is not a mere technicality; it reflects a Congressional judgment that private litigation is not an appropriate means to ensure achievement of legislative goals. With respect to the Medicaid Act, particularly §1396(a)(30)(A), the legislative goal is to provide care to patients, not revenue to providers. Congress has determined that provider suits against state officials over rate setting decisions is not an appropriate means to further that goal. See Long-Term Care Pharmacy Alliance v. Ferguson, 362 F.3d at 58 (“the generality of the goals and the structure for implementing them suggests that plan review by the [federal] Secretary is the central means of enforcement intended by Congress”).
Despite that Congressional judgment, the plaintiffs would have the Court do directly under the supremacy clause exactly what it cannot do under the statute itself. The supremacy clause “is not a source of any federal rights; rather, it secure(s) federal rights by according them priority whenever they come in conflict with state law.” Dennis v. Higgins, 498 U.S. 439, 450 (1991) (internal quotations and citations omitted). As discussed supra, the provision of the Medicaid Act on which the plaintiffs rely, § 1396(a)(30)(A), does not confer any rights on providers of Medicaid services; its effect, rather, is to direct the Secretary of Health and Human Services to make sure that state Medicaid plans provide “methods and procedures” to meet the specified goals.
The plaintiffs rely on cases seeking to enjoin enforcement of a state statute, regulation, or constitutional provision based on the supremacy clause. E.g., Independent Living Ctr. of S. Cal, Inc. v. Shewry, 543 F.3d 1050, 1052-53, 1065-66 (9th Cir. 2008); Quest Corp. v. City of Santa Fe, 380 F.3d 1258, 1266 (19th Cir. 2004); Pharm. Research & Mfrs of America (PhRMA) v. Concannon, 249 F.3d 66, 73 (1st Cir. 2001); St. Thomas St. John Hotel & Tourism Ass’n v. Virgin Islands, 218 F.3d 232, 241 (3d Cir. 2000). This case does not challenge any statute, regulation, or constitutional provision. See Equal Access for El Paso, Inc. v. Hawkins, 562 F.3d 724, 730 (5th Cir. 2009). The plaintiffs also cite Lividas v. Bradshaw, 512 U.S. 107, 118-19 (1994). That case was brought under 42 U.S.C. §1983, to enjoin a state official from applying an administrative policy that had the effect of penalizing the exercise of rights protected by the National Labor Relations Act, a statute that had previously been held to confer a private right of action. Nothing similar is involved here; as discussed supra, the provision of the Medicaid Act on which these plaintiffs rely does not confer any rights on them.[17] The Court concludes, therefore, that the supremacy, clause does not provide a vehicle for these plaintiffs to challenge the rates set by the Secretary in their contracts.
Moreover, even if the plaintiffs could bring their challenge to the rates set in this manner, the facts alleged do not provide plausible support for their claim. The amended complaint asserts, in substance, that the rates set place BMC’s economic health at risk. The Court does not discount the seriousness of that risk. But the Medicaid statute does not guarantee the economic well-being of any particular provider. Nothing in the complaint indicates that the Commonwealth’s Medicaid plan fails to provide “methods and procedures .. . relating to payment” that are such as to “ensure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available ... at least to the extent that such care and services are available to the general population in the geographic area.” The facts alleged indicate that BMC and BMCHP have continued *112 to participate in Medicaid, and will continue to do so as long as they continue to exist. Nothing alleged indicates any actual or likely shortage of providers to serve MassHealth patients in the Boston area.[18] See Methodist Hospitals, Inc. v. Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996) (“Under Sec. 1396a(a)(30) . .. states may behave like other buyers of goods and services in the marketplace: they may say what they are willing to pay and see whether this brings forth an adequate supply”).
The allegations of the plaintiffs’ complaint present a serious problem of substantial importance to the public. BMC, like many other institutions that provide vital services (indeed, like state government itself), is suffering under extreme economic pressure. Resource shortages similarly threaten the well-being of many vulnerable segments of the population. That circumstance does not confer on the Court the power to order reallocation of the limited public resources available. If there is a solution to the problem plaintiffs raise, the place to find it is in the political branches of government, not in the Courts. See Franklin Memorial Hospital v. Harvey, 575 F.3d at 130.
CONCLUSION AND ORDER
For the reasons stated, the Defendant’s Motion for Judgment on the Pleadings on All Claims is ALLOWED.

The Court recites the background based on the factual allegations of the amended complaint, contracts and other public documents referenced in the amended complaint and provided by defendants as attachments to the affidavit of Teresa Yannetti, see Marram v. Kobrick Offshore Fund, Ltd, 442 Mass. 43, 45 n. 4 (2004), and statutory provisions necessary to an understanding of the facts.

G.L.c. 118G, §1, defines a “disproportionate share hospital” as “any acute hospital that exhibits a payer mix where a minimum of sixty-three per cent of the acute hospital’s gross patient service revenue is attributable to Title XVIII and Title XSX of the federal Social Security Act, other government payors and free care.”

Chapter 118G, §1, defines “financial requirements,” as “a hospital’s requirement for revenue which shall include, but not be limited to, reasonable operating, capital and working capital costs, the reasonable costs of depreciation of plant and equipment and the reasonable costs associated with changes' in medical practice and technology.”

Subsection (b) addresses rates for emergency services, requiring that such rates “shall reflect the reasonable costs of providing such care . . . and shall take into account the characteristics of the hospital in which such care is provided,” including a list of factors, among which is the hospital’s status as a “disproportionate share hospital.” Rates for emergency services are not in issue in this case.

he complaint does not allege that any such notice of termination has occunred.

Statutoiy changes since 1996 transferred responsibility for rate setting to the Secretary.

The Secretary refers to these payments as intended “to facilitate the transition from a fee-for-service delivery system to a system of managed care.”

The complaint alleges, and the Secretary appears to agree, that based on the amount of services provided, BMC would receive two-thirds of the §122 amount, approximately $191,300,000, and Cambridge Health Alliance (CHA) would receive the remaining one-third. Section 122 goes on to provide that, for 2008 and 2009, twenty-five percent of the payments shall be made in accordance with three specified criteria: success in enrolling uninsured patients in specified plans: progress in minimizing the number using uncompensated care, and submission of written plans detailing utilization of supplemental funds. It does not define success or progress.

This allegation amounts to a legal conclusion, rather than an allegation of fact. The Court does not accept an allegation of a legal conclusion as correct for purposes of the present motion, but recites it to clarify the dispute. The Secretary disagrees with BMC’s interpretation of §122, contending in essence that its requirement is met if BMC’s total reimbursement is at least the amount provided by that section.

This provision is the MassHealth appropriation for 2009.

In this respect, the cited statutes contrast with G.L.c. 118G, §§7, 9, and 12, which provide for judicial review of certain Medicaid rates pursuant to G.L.c. 30A. The plaintiffs do not contend that those provisions apply to the rates in issue here. See Salvas v. Wal-Mart Stores, Inc., 452 Mass. at 373 (statutory grant of private right of action to enforce certain provisions “weighs heavily against recognizing” implied right as to other provisions).

The Court noted particularly that the statute explicitly granted a right of judicial review to candidates denied public campaign funds as a result of administrative decertification, and observed that it would be “perverse” to read the statute “as invoking sovereign immunity only where the Commonwealth withholds payments to certified candidates who maintain their bona fides, while providing that public funds be returned to a candidate who has been wrongfully decertified.” 436 Mass. at 174.

The Court will address infra the plaintiffs’ contention that they are compelled to participate in MassHealth.

The facts alleged identify the source of the duress as BMCHP’s own economic necessity, not any wrongful or oppressive conduct by EOHHS. That does not amount to duress as a matter of law. See Cabot Corp. v. AVX Corp., 448 Mass. at 637; Int'l Underwater Contrs., Inc. v. New England Tel. & Tel. Co., 8 Mass.App. 340, 342 (1979).

Count V is labeled “Declaratory Judgment and Relief in the Nature of Mandamus,” and alleges in paragraph 110 the existence of an “actual and justiciable controversy” that is “concrete, rather than remote or abstract.” From there, however, it proceeds to assert a claim for relief in the nature of mandamus, rather than any declaration of rights, status, or legal relation of the parties. The Court therefore does not further address any question of declaratory judgment, except to note that the declaratoryjudgment act, G.L.c. 231A, merely provides a form of remedy for disputes otherwise within the jurisdiction of the Court: it does not provide either an independent basis of subject matter jurisdiction, see Pratt v. City of Boston, 396 Mass. 37, 42-43 (1985), or a means of judicial review of discretionary actions of public officials. See School Committee of Hatfield v. Board of Educ., 372 Mass. 513, 516-17 (1977).

As noted supra, other provisions of G.L.c. 118G, but not §11, provide for review of certain rate setting decisions under G.L.c. 30A. It would be anomalous to construe §11 as authorizing certiorari review, when the legislature deliberately excluded it from the review provided in those provisions.

The plaintiffs do not purport to sue under 42 U.S.C. §1983. The relief they seek, although it includes declarations, is primarily monetary.

The Secretary reports that all Massachusetts hospitals are MassHealth providers.