SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## Englewood Hospital & Medical Center v. State (A-16-24) (089696)

**Argued April 1, 2025 -- Decided July 16, 2025**

**FASCIALE, J., writing for a unanimous Court.**

In this appeal, plaintiffs -- a group of hospitals that, as defined by statute, serve a disproportionate number of low-income patients -- challenge New Jersey's charity care program, which prevents them from turning away patients for inability to pay and from billing qualified patients. Plaintiffs argue that violates federal and state constitutional protections against unlawful takings by the government.

The trial judge dismissed some of plaintiffs' takings claims for failure to exhaust administrative remedies and granted summary judgment to defendants on the remaining takings claims, finding that the claims satisfied "none of the criteria for a per se taking" and likewise did not constitute regulatory takings. The Appellate Division found that it would be futile to remand the dismissed claims to an agency but affirmed the grant of summary judgment in favor of defendants on the basis that charity care does not effect a taking. 478 N.J. Super. 626, 641-42, 649 (App. Div. 2024). The Court granted certification. 258 N.J. 556 (2024).

**HELD:** Under the facts as presented in this case, charity care is not an unconstitutional "per se" physical taking of private property without just compensation. It does not grant an affirmative right of access to occupy hospitals; it does not give away or physically set aside hospital property for the government or a third party; and it does not deprive hospitals of all economically beneficial use of their property. Charity care is also not an unconstitutional "regulatory" taking of private property without just compensation. That is due to the highly regulated nature of the hospital industry and the legislatively declared paramount public interest that the charity care program serves. Hospitals remain free to challenge their annual subsidy allocations through administrative channels and to lobby the Legislature to make policy changes that would address more broadly the concerns they raise. But the charity care program does not run afoul of the Takings Clause, and the Court therefore affirms the Appellate Division's judgment, as modified.

1. Noting that the medical tradition of providing free care to indigent patients dates back at least 178 years, the Court reviews the history and enactment of the charity

1

care program. N.J.S.A. 26:2H-18.64 requires that "[n]o hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment." And regulations specify that "[p]ersons determined to be eligible for charity care shall not receive a bill for services or be subject to collection procedures." N.J.A.C. 10:52-11.14. Recognizing that charity care burdens disproportionate share hospitals (DSHs) -- designated in accordance with federal laws and regulations, see N.J.S.A. 26:2H-18.52 -- more than other hospitals, the Legislature created the Health Care Subsidy Fund (HCSF) to distribute annual subsidies. Id. at .58(a). The Legislature appropriates funds from the General Fund to the HCSF and then allocates subsidies to DSHs. Id. at .58d, .59(a). But a hospital receives only its proportionate share of the total subsidy funded by the Legislature for that year, and charity care is reimbursed to DSHs at Medicaid-priced dollar amount rates. Id. at .59i(a); N.J.A.C. 10:52-13.4. Further, the State acknowledges that it has not always been able to maintain the reimbursement floor for the hospitals receiving the lowest reimbursement rate (43%) and that some hospitals have received only 1% reimbursement. A DSH can file an administrative appeal from its subsidy amount, N.J.A.C. 10:52-13.4(f)(1) to (2), and can seek an adjustment to its Medicaid final rate, id. at -14.17(c). (pp. 4-10)

2. The Federal and State Constitutions each prohibit the taking of private property for public use without just compensation. In a takings analysis, a court asks: (1) whether the plaintiff has a protected property interest; (2) if so, whether the government's action constituted a taking; (3) if yes, whether that taking was for a public use; and (4) if yes to all of the above, whether the statute adequately provides for just compensation. Here, the parties dispute whether the allocation of space, services, and care products necessary to comply with the charity care program constitutes a government taking. Case law recognizes two varieties of takings: "per se" takings and "regulatory" or "use-restriction" takings. There are two main subcategories of "per se" takings: physical appropriation -- when the government directly takes private property for its own use or use by a third party -- and government-authorized physical invasions or occupations of private property. A regulatory taking, in contrast, occurs when the government restricts an owner's ability to use his own property. In some cases, that restriction can rise to the level of a "per se" taking by leaving the property owner without economically beneficial or productive options for the property's use. In other cases, however, a taking still may be found under the flexible test developed in Penn Central Transportation Co. v. New York City, which balances factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action. 438 U.S. 104, 124 (1978). Because plaintiffs argue that the charity care program resulted in a "per se" taking during the years for which they seek relief, the Court considers in turn each of the categories of property plaintiffs allege have been subject to a taking -- supplies, services, and facilities -- to determine whether a "per se" taking has occurred. (pp.16-21)

2

3.  The Court first considers whether the use of medical supplies in the course of providing charity care is tantamount to the government physically acquiring hospitals' property for public use.  The Court finds the program here distinguishable from Horne v. Department of Agriculture, in which the U.S. Supreme Court held that an order requiring a certain percentage of a raisin crop to be physically set aside for the government "free of charge" to dispose of at its discretion was an unconstitutional taking.  576 U.S. 351, 354, 361, 364-65 (2015).  In contrast to the Raisin Marketing Order at issue in Horne, the charity care program does not require hospitals to "physically set aside" any portion of their property.  The statute and regulation are not written from the perspective of obtaining certain real or personal property, and no transfer of title or ownership occurs.  The supplies are furnished in accordance with the hospitals' own determinations of what supplies are needed and how they should be used, while providing care.  The Court therefore rejects the notion that the charity care program specifically constitutes a "per se" taking by requiring hospitals to treat patients whose care may entail the use of supplies from the hospitals' inventory.  (pp. 21-24)

4.  The Court reaches a similar conclusion as to the services offered in the course of providing mandated charity care.  The Court determined that services can be considered "property" in connection with challenges to the mandatory representation of indigent defendants by attorneys.  See Madden v. Township of Delran, 126 N.J. 591, 602 (1992).  However, in State v. Rush, the Court expressly held that assigning counsel "to defend indigents charged with crime" did not violate constitutional provisions including the Takings Clause, noting that, "if one accepts the premise that the duty to defend the poor is a professional obligation rationally incidental to the right accorded a small segment of the citizenry to practice law, these claims fall away."  46 N.J. 399, 402, 408 (1966).  The Court did determine, however, that "in fairness," as an "important policy issue," "the bar alone should [not] be required to discharge a duty which constitutionally is the burden of the State" and "suggest[ed] compensation at 60% of the fee a client of ordinary means would pay an attorney of modest financial success."  Id. at 402, 408-09, 413.  Like the Court found with respect to unpaid attorney assignments in Rush, and given both the nature of the medical profession and its long tradition of providing care to those in need without regard to their ability to pay, the Court finds unavailing the argument that charity care constitutes a taking as to services furnished by the hospitals.  The Court does not suggest that it is fair for medical professionals and hospitals to bear, alone, the cost of providing services to those who cannot pay for them.  But, in contrast to administration of the legal field, over which the New Jersey Constitution grants the Court exclusive jurisdiction, N.J. Const. art. VI, § 2, ¶ 3, the Court has no authority to propose what a fair-though-not-constitutionally-mandated ratio of burden-bearing would be for hospital services.  (pp. 25-27)

3

5.  The Court also finds that, with respect to the hospitals' facilities, charity care does not constitute an unconstitutional physical invasion or occupation of private property.  Charity care imposes no right to take access to the hospitals, which are in the business of providing medical care to patients and are open to the public.  Any use of the hospitals' facilities in treating charity care patients is not the specific objective or mandate of the program; it is incidental to the hospitals' determination of how to provide the care the program requires.  Charity care is thus distinguishable from circumstances in which the U.S. Supreme Court has found a physical taking by invasion or occupation, such as Cedar Point Nursery v. Hassid, in which the Court held that a regulation granting labor organizers a "right to take access" to the property of an agricultural employer for three hours a day, up to 120 days a year, was a "per se" taking.  594 U.S. 139, 143, 152 (2021).  In Cedar Point, the Court recognized that "[l]imitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public," distinguishing PruneYard Shopping Center v. Robins, 447 U.S. 74, 77 (1980).  Id. at 157.  PruneYard makes clear that, although a property owner has a right to exclude, not every government infringement on that right is a taking requiring just compensation.  The Court finds PruneYard more applicable to plaintiffs' challenge here than Cedar Point and other cases involving invasions of property not otherwise open to the public.  (pp. 27-30)

6.  Because charity care does not involve a taking under any of the "per se" categories, the Court considers whether the program effects a regulatory taking under the Penn Central test.  The Court agrees with the Appellate Division that the first factor -- the economic impact of the regulation -- favors plaintiffs.  However, plaintiffs operate in a highly regulated industry that has a long practice of providing charitable care.  Thus, their "investment-backed expectations" are diminished, and the second Penn Central factor weighs against finding a taking.  And the third Penn Central factor -- "the character of the governmental action" -- strongly favors finding no unconstitutional "regulatory" taking in light of the "paramount public interest" it serves.  See N.J.S.A. 26:2H-18.51(a).  On balance, charity care does not effect a "regulatory" taking requiring just compensation.  (pp. 30-40)

7.  Noting that hospitals are entitled to subsidies as part of charity care, the Court explains the administrative mechanisms for challenging subsidy amounts and that the better course of action is to seek redress through the state's political process rather than under the Takings Clause.  (pp. 40-41)

    **AFFIRMED AS MODIFIED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE FASCIALE's opinion.**

4

SUPREME COURT OF NEW JERSEY
A-16 September Term 2024
089696

Englewood Hospital & Medical Center,
Hudson Hospital Opco, LLC,
d/b/a Christ Hospital, IJKG Opco,
LLC, d/b/a Bayonne Medical
Center, HUMC Opco, LLC,
d/b/a Hoboken University
Medical Center, Capital
Health Regional Medical
Center, Capital Health Medical
Center – Hopewell, Cooper University
Hospital, Hackensack Meridian Health
Pascack Valley Medical Center,
JFK Medical Center, Our Lady of
Lourdes Medical Center, Lourdes
Medical Center of Burlington
County, St. Francis Medical Center,
Hackensack Meridian Health – Mountainside
Medical Center, and Prime Healthcare
Services – St. Mary's Passaic, LLC, d/b/a
St. Mary's General Hospital,

Plaintiffs-Appellants,

v.

The State of New Jersey, the State of
New Jersey Department of Human
Services, Sarah Adelman in her capacity
as Commissioner of the Department
of Human Services, State of New Jersey
Department of Human Services,
Division of Medical Assistance and Health
Services, Meghan Davey, in her capacity
as Director of the Division of Medical

1

Assistance and Health Services, State
of New Jersey Department of Health,
and Dr. Kaitlan Baston, in her capacity
as Commissioner of the Department of Health,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
478 N.J. Super. 626 (App. Div. 2024).

| Argued | Decided |
| --- | --- |
| April 1, 2025 | July 16, 2025 |

John Zen Jackson argued the cause for appellants
(Greenbaum, Rowe, Smith & Davis, attorneys; John Zen
Jackson, James A. Robertson, Robert B. Hille, and Paul
L. Croce, on the briefs).

Tim Sheehan, Deputy Attorney General, argued the cause
for respondents (Matthew J. Platkin, Attorney General,
attorney; Jeremy M. Feigenbaum, Solicitor General,
Michael L. Zuckerman, Deputy Solicitor General,
Melissa H. Raksa and Donna Arons, Assistant Attorneys
General, of counsel, and Tim Sheehan, and Jacqueline R.
D'Alessandro, Deputy Attorney General, on the briefs).

David McMillin argued the cause for amici curiae Legal
Services of New Jersey and Disability Rights New Jersey
(Legal Services of New Jersey, and Disability Rights
New Jersey, attorneys, Dawn K. Miller, David McMillin,
Rebecca Schore, Bren Pramanik, Adrienne N. Langlois,
and Craig P. Ismaili, on the brief).

JUSTICE FASCIALE delivered the opinion of the Court.

Under New Jersey's charity care program, hospitals cannot turn away a patient for inability to pay, N.J.S.A. 26:2H-18.64, and patients who qualify for charity care shall not be billed for services rendered, N.J.A.C. 10:52-11.4. Instead, "disproportionate share hospitals" (DSHs), or hospitals that serve a disproportionate number of low-income patients, see N.J.S.A. 26:2H-18.52, receive annual subsidies from the Health Care Subsidy Fund (HCSF) in exchange for providing charity care, see N.J.S.A. 26:2H-18.52, .58, .58d.

In this appeal, plaintiffs -- a group of DSHs -- argue that the charity care program compels them to "provide charity care patients access to their facilities" and to utilize "hospital space, supplies, and services" for treatment, but that the subsidy amounts "fail[] to even cover the basic cost of the care." That system, plaintiffs argue, violates federal and state constitutional protections against unlawful takings by the government.

Under the facts as presented in this case, we hold that charity care is not an unconstitutional "per se" physical taking of private property without just compensation. It does not grant an affirmative right of access to occupy hospitals; it does not give away or physically set aside hospital property for the government or a third party; and it does not deprive hospitals of all economically beneficial use of their property. We also hold that charity care is not an unconstitutional "regulatory" taking of private property without just

3

compensation. That is due to the highly regulated nature of the hospital industry and the legislatively declared paramount public interest that the charity care program serves.

Hospitals remain free to challenge their annual subsidy allocations through administrative channels and to lobby the Legislature to make policy changes that would address more broadly the concerns they raise. But the charity care program does not run afoul of the Takings Clause, and we therefore affirm the Appellate Division's judgment, as modified.

I.

The medical tradition of providing free care to indigent patients dates back at least 178 years. Indeed, at the time of its founding in 1847, the American Medical Association (AMA) created the Code of Medical Ethics, which stated that "[p]overty . . . should always be recognized as presenting [a] valid claim[] for gratuitous services." Am. Med. Ass'n, Code of Med. Ethics 105-06 (1847). In an exercise of its police powers to protect the general health and welfare of its citizens, the New Jersey Legislature has codified that tradition and provided a mechanism to address the financial burden it poses for medical service providers.

In 1986, the Legislature declared that "access to quality health care shall not be denied to residents of the State because of their inability to pay." L.

4

1986, c. 204, § 1. It formed the Uncompensated Care Trust Fund, which enabled hospitals to "collect their reasonable cost of approved uncompensated care." See L. 1991, c. 187, § 1(b) (describing that Fund, which expired at the end of 1990). In 1991, as part of the "Health Care Cost Reduction Act," L. 1991, c. 187, § 85, the Legislature created the "New Jersey Health Care Trust Fund" as a "nonlapsing fund . . . to distribute payments for the cost of uncompensated care," id. at § 4.

In 1992, in anticipation of the expiration of the New Jersey Health Care Trust Fund, see Sponsor's Statement to A. 2100 41 (L. 1992, c. 160), the Legislature created the current charity care program through the Health Care Reform Act, see L. 1992, c. 160, § 39. In doing so, the Legislature declared that "[i]t is of paramount public interest for the State to take all necessary and appropriate actions to ensure access to and the provision of high quality and cost-effective hospital care to its citizens." N.J.S.A. 26:2H-18.51(a).

The statute accordingly requires that "[n]o hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment." Id. at .64. Although the statute bars only the denial of admission, the regulations specify that "[p]ersons determined to be eligible for charity care shall not receive a bill for services or be subject to collection procedures," and that "[p]ersons determined to be eligible for

5

reduced charity care shall not be billed or subject to collection procedures for the portion of the bill that is reduced charge charity care." N.J.A.C. 10:52-11.14. Consequently, "every acute care hospital in this State is required to provide care to anyone who seeks care without regard to the ability to pay." Kuchera v. Jersey Shore Fam. Health Ctr., 221 N.J. 239, 254 (2015). A hospital that violates that requirement is subject "to a civil penalty of $10,000 for each violation." N.J.S.A. 26:2H-18.64. And a new health care facility -- unless the facility is of a type exempted by statute, N.J.A.C. 8:33-3.5 -- can be established only if it will "provide services to medically underserved populations" and "comply with State and Federal laws regarding its obligation not to discriminate against low income persons." Id. at -4.9.

The charity care program requires that hospitals "provide all patients with an individual written notice of the availability of charity care and Medicaid/NJ FamilyCare . . . at the time of service, but no later than the issuance of the first billing statement to the patient." N.J.A.C. 10:52-11.5(a). Hospitals must apply the criteria set forth in the relevant regulations to determine whether a patient is eligible for charity care. Id. at (b) to (d). To qualify, a patient must meet certain income and asset eligibility requirements. For income criteria, there are two tiers, charity care and reduced charity care:

> 1. A person whose individual or, if applicable, family income . . . is less than or equal to 200 percent of the

6

[U.S. Department of Health and Human Services (HHS)] Poverty Guidelines shall be eligible for charity care for necessary health services without cost.

2. A person whose individual, or, if applicable, family, income . . . is greater than 200 percent of the HHS Poverty Guidelines but not more than 300 percent of these guidelines is eligible for charity care at a reduced rate . . . .

[Id. at -11.8(b).]

Applicants must provide proof that, as of the date of service, (1) their individual assets do not exceed $7,500 and, if applicable, that (2) their family assets do not exceed $15,000. Id. at -11.10(a).

Recognizing that charity care burdens DSHs -- designated in accordance with federal laws and regulations, see N.J.S.A. 26:2H-18.52 -- more than other hospitals, the Legislature created the HCSF in the New Jersey Department of Health (DOH) to distribute annual subsidies. Id. at .58(a) ("The fund shall be a nonlapsing fund dedicated for use by the State to: (1) distribute charity care and other uncompensated care disproportionate share payments to hospitals . . . ."); see also id. at .52 ("'Charity care' means care provided at disproportionate share hospitals that may be eligible for a charity care subsidy pursuant to this act."). As to the necessity of creating the HCSF, the Legislature explained,

Access to quality health care shall not be denied to residents of this State because of their inability to pay

7

for the care; there are many residents of this State who cannot afford to pay for needed hospital care and in order to ensure that these persons have equal access to hospital care, it is necessary to provide [DSHs] with a charity care subsidy supported by a broad-based funding mechanism.

[Id. at .51(c).]

The Legislature appropriates funds from the General Fund to the HCSF. Id. at .58d. New Jersey hospitals are also required to pay 0.53% of their total operating revenue to the DOH each year for deposit into the HCSF. Id. at .62(c)(1). The DOH then allocates subsidies for the State fiscal year using the complex formula set forth in N.J.S.A. 26:2H-18.59i, discussed below, and transfers the funds to the Department of Human Services (DHS) for distribution to DSHs. Id. at .59(a).

But charity care subsidies are not a direct, dollar-for-dollar reimbursement of the costs hospitals expend in providing charity care. "[R]ather, a hospital receives only its proportionate share of the total subsidy funded by the Legislature for that year." Univ. of Med. & Dentistry v. Grant, 343 N.J. Super. 162, 165 (App. Div. 2001); see N.J.S.A. 26:2H-18.59i(b). Further, charity care is reimbursed to DSHs at Medicaid-priced dollar amount rates. N.J.S.A. 26:2H-18.59i(a); N.J.A.C. 10:52-13.4. In other words, "[h]ospitals record the value of the charity care they provide at their usual and customary charges, but . . . the charity care subsidy is based on the amount

8

Medicaid would pay for such services." Grant, 343 N.J. Super. at 166-67.

N.J.S.A. 26:2H-18.59i(c) directs that, to ensure subsidies "remain viable and appropriate, the State shall maintain the charity care subsidy at an amount not less than 75 percent of the Medicaid-priced amounts of charity care provided by hospitals in the State."

In order to determine how DSHs receive their proportionate share of reimbursements, each hospital is "ranked in order of its hospital-specific, relative charity care percentage, or RCCP, by dividing the amount of hospital-specific gross revenue for charity care patients by the hospital's total gross revenue for all patients." N.J.S.A. 26:2H-18.59i(b)(1). Hospitals receive charity care subsidies on a sliding scale based on that ranking: each of the ten with the highest RCCP receives a subsidy equal to 96% of its "hospital-specific reimbursed documented charity care." Id. at .59i(b)(2). The eleventh gets 94%, and each hospital ranked twelfth or below gets two percent less than the hospital immediately above it. Ibid. But no hospital should get less than 43%. Id. at .59i(b)(4). The State acknowledges that it has not always been able to maintain the reimbursement floor at the 43% rate and that some hospitals have received only 1% reimbursement.

The ranking system aside, "each of the hospitals located in the 10 municipalities in the State with the lowest median annual household income

9

according to the most recent census data, shall be ranked" from highest to lowest for "hospital-specific reimbursed documented charity care." Id. at .59i(b)(3). "The hospital in each of the 10 municipalities, if any, with the highest documented hospital-specific charity care" gets 96%. Ibid.

A DSH can appeal its subsidy amount because of a calculation error or other reason to the DOH, N.J.A.C. 10:52-13.4(f)(1) to (2), and can seek an adjustment to its Medicaid final rate through the Division of Medical Assistance and Health Services within the DHS (the Division), id. at -14.17(c).

II.

Here, plaintiffs are several for-profit and non-profit general acute hospitals that qualify as DSHs. Defendants include the State of New Jersey (State), the DHS, the Division, the DOH, and several state officials. In their complaint, plaintiffs "contend that in multiple years from 2002 to present they were required to provide medical treatment including space, supplies, and services, to charity care and Medicaid patients," but that, "[i]n all relevant years, the payments provided by Defendants for the treatment of these patient populations have covered only a small fraction of the costs incurred by the Plaintiff Hospitals in treating these patient populations in those years." Plaintiffs thus allege that the charity care program effected a "taking of private property for public use without just compensation being paid," in

10

contravention of "[t]he Fifth and Fourteenth Amendments of the United States Constitution as well as Article I, Paragraph 20 of the New Jersey Constitution."

After discovery, plaintiffs and defendants filed cross-motions for summary judgment. The trial judge dismissed some of plaintiffs' takings claims on ripeness grounds for failure to exhaust administrative remedies and granted summary judgment to defendants on the remaining takings claims. The judge concluded that plaintiffs advanced "as-applied" rather than "facial" challenges because they did "not argue the statute as written is unconstitutional or seek to vindicate the rights of hospitals statewide" and because their "prayers for relief, if ultimately granted, would require . . . individualized declaratory paragraphs." Analyzing plaintiffs' claims accordingly, the trial judge found that they "satisfy none of the criteria for a per se taking" and likewise did not constitute regulatory takings.

On appeal, the Appellate Division categorized plaintiffs' claims as facial rather than as-applied challenges and found that it would be futile to remand the dismissed claims to an agency. Englewood Hosp. & Med. Ctr. v. State, 478 N.J. Super. 626, 641-42 (App. Div. 2024). The appellate court determined, however, that the charity care program effected neither a "per se"

11

nor a regulatory taking and therefore affirmed the grant of summary judgment in favor of defendants.  Id. at 649.

We granted plaintiffs' petition for certification.  258 N.J. 556 (2024).  We then granted motions by Legal Services of New Jersey (LSNJ) and Disability Rights New Jersey (DRNJ) to appear jointly as amici curiae.

### III.

Plaintiffs argue that the charity care program and its related regulations compel them to "provide charity care patients access to their facilities" and to utilize "hospital space, supplies, and services" for treatment, but that the subsidy amounts "fail[] to even cover the basic cost of the care."  Plaintiffs describe those obligations as a "per se" appropriation, i.e., a taking of physical property for public use without just compensation.  Plaintiffs also contend that the State has deprived them "of their right to exclude others from their property."  Although plaintiffs argue that they should prevail on the basis of a "per se" analysis, they contend that the trial judge and Appellate Division erred in finding no regulatory taking, arguing that participation in a regulated industry cannot be deemed to waive their Fifth Amendment right to be free from governmental takings without just compensation.  Either way, plaintiffs seek "just compensation," beyond the amount made available under the HCSF

12

controlled by annual legislative appropriations. Plaintiffs contend that their takings challenges are "as-applied."

Defendants argue that charity care is not a "per se" taking because it does not deprive plaintiffs of "their right to exclude others from their property," physically appropriate plaintiffs' real or personal property, or "remove all economically beneficial uses of [their] property." Instead, defendants assert that charity care regulates how plaintiffs use their property as to qualified indigent patients. Thus, defendants contend that plaintiffs have essentially made a regulatory takings challenge, which fails under the "flexible, context-specific test" outlined by the U.S. Supreme Court in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). Defendants agree with the Appellate Division that plaintiffs present facial challenges.

LSNJ/DRNJ emphasize that charity care "provides bedrock access to health care for the state's lowest-income residents." They support defendants' contentions that charity care does not constitute a "per se" or "regulatory" taking. LSNJ/DRNJ also contend that charity care continues New Jersey's long tradition of making medical care available for those in need of financial assistance. They note that in 1847, at the time of its founding, the AMA itself recognized a physician's duty to provide care for such patients. LSNJ/DRNJ

13

provide statistics demonstrating that New Jersey hospitals have cared for charity patients going back at least as far as 1906 and that, as early as 1979, it has been New Jersey's public policy to provide health care at hospitals regardless of ability to pay. And finally, amici stress that charity care ensures that plaintiffs "receive substantial compensation" through annual subsidies.

IV.

"[A] motion for summary judgment must be granted 'if . . . there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law.'" Hyman v. Rosenbaum Yeshiva of N. Jersey, 258 N.J. 208, 228 (2024) (quoting R. 4:46-2(c)). Here, we decide a legal question: whether requiring plaintiff hospitals, during the years relevant to the complaint, not to bill patients eligible for charity care and to instead receive the program subsidies provided pursuant to statute and regulation constituted a Takings Clause violation.[1] Our review of questions of

---

[1] The parties dispute whether plaintiffs' takings challenges are facial or as-applied. Although both types of claims can arise from the same legislative or regulatory mandates, see, e.g., San Remo Hotel, L.P. v. City & County of San Francisco, 545 U.S. 323, 330 n.4 (2005) (noting that the plaintiffs in that case had presented facial and as-applied Takings Clause violations that were "predicated on the same rationale"), the claims are fundamentally distinct. In non-First Amendment federal law "cases, a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024)

14

law is de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

---

(first quoting United States v. Salerno, 481 U.S. 739, 745 (1987); and then quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)). Under New Jersey law, it is "clear" that a statute "'is not facially unconstitutional if it operates constitutionally in some instances.'" In re Contest of Nov. 8, 2011 Gen. Election, 210 N.J. 29, 47 (2012) (quoting Whirlpool Props., Inc. v. Dir., Div. of Tax'n, 208 N.J. 141, 175 (2011)). Unlike a facial challenge, "[a]n as applied challenge 'requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the [plaintiff] to whom it was applied of a protected right'" -- here, the protections afforded under the Takings Clause. See Goe v. Zucker, 43 F.4th 19, 30 (2d Cir. 2022) (alteration in original) (quoting Field Day, LLC v. County of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006)); see also City of Los Angeles v. Patel, 576 U.S. 409, 415 (2015) ("A facial challenge is an attack on a statute itself as opposed to a particular application.").

Plaintiffs in this case do not argue that the charity care program is inherently unconstitutional even if it were to fully fund costs, and they declined, at oral argument, to take a position as to whether some level of subsidy below 100% reimbursement but above the level of compensation they received could pass constitutional muster, preferring to focus their argument on the alleged insufficiency of the subsidies that they received. This case comes before us cloaked as a freestanding legal question about whether there is a taking because that is the point on which plaintiffs' challenge was decided against them by the trial judge and Appellate Division. Our response to the legal question, to the extent that all hospitals provide care and thus supply space, supplies, and services similarly, will undoubtedly have application beyond this case. Regardless of whether the challenge is facial or as-applied, we hold that the charity care program in its current form does not constitute an unconstitutional per se or regulatory taking. Nevertheless, plaintiffs maintain they are asserting as-applied challenges.

15

A.

The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "The Clause applies to the States through the Fourteenth Amendment." 257-261 20th Ave. Realty, LLC v. Roberto, 259 N.J. 417, 437-38 (2025). The New Jersey Constitution provides similar protections. See N.J. Const. art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation."). The protection in our State Constitution is "coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution." Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010).

In a takings analysis, a court asks: (1) whether the plaintiff has a protected property interest; (2) if so, whether the government's action constituted a taking; (3) if yes, whether that taking was for a public use; and (4) if yes to all of the above, whether the statute adequately provides for just compensation. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000-01 (1984).

Here, no one contests that plaintiffs have a property interest in their facilities and materials, or that the charity care program constitutes a public use. What the parties dispute is whether the allocation of space, services, and

16

care products necessary to comply with the charity care program constitutes a government taking.

Case law recognizes two varieties of takings: "per se" takings and "regulatory" or "use-restriction" takings. Cedar Point Nursery v. Hassid, 594 U.S. 139, 147-49 (2021). The distinction between the two "is not . . . whether the government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree)." Id. at 149. Rather, the "essential question . . . is whether the government has physically taken property for itself or someone else -- by whatever means -- or has instead restricted a property owner's ability to use his own property." Ibid.

There are two main subcategories of "per se" takings. First, the "'clearest sort of taking'" is through "physical appropriation." Id. at 148 (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001)). A physical appropriation occurs when the government directly takes private property for its own use or use by a third party, as through the exercise of "its power of eminent domain to formally condemn property" or by "physically tak[ing] possession of property without acquiring title to it," such as "by taking possession and operating control" of a mine. United States v. Pewee Coal Co., 341 U.S. 114, 115-17 (1951) (plurality opinion cited as example in Cedar Point).

17

The second category of a physical "per se" taking occurs when there is a "government-authorized physical invasion[]" or a physical occupation of private property. Cedar Point, 594 U.S. at 148, 150-51. Such invasions are "per se" takings because of "the central importance to property ownership of the right to exclude." Id. at 150. "The right to exclude is 'one of the most treasured' rights of property ownership." Id. at 149 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982)). Examples of government-authorized invasions of property include "recurring flooding as the result of building a dam"; "frequently [flying] military aircraft low over [a] farm"; "the appropriation of an easement" allowing access to a privately owned marina; "requiring landlords to allow cable companies to install equipment on their properties"; the "appropriation of an easement" requiring private property owners to allow the public to utilize their property to access the beach; and allowing union organizers to "take access" to private property. Id. at 148, 150-52.

A regulatory taking, in contrast, occurs when the government restricts "an owner's ability to use his own property." Id. at 148. In some cases, that restriction can rise to the level of a "categorical" taking by leaving the property owner "without economically beneficial or productive options for [the property's] use." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015, 1018

18

(1992). "As Justice Brennan explained: 'From the government's point of view, the benefits flowing to the public from preservation of open space through regulation may be equally great as from creating a wildlife refuge through formal condemnation or increasing electricity production through a dam project that floods private property.'" Ibid. (quoting San Diego Gas & Elec. Co. v. City of San Diego, 450 U.S. 621, 652 (1980) (Brennan, J., dissenting)). Thus, when there is a "practical equivalence . . . of negative regulation and appropriation," a use restriction may constitute a "per se" taking as surely as one of the forms of physical takings. See id. at 1018-19; Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538 (2005).

In other cases, however, "when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found," Murr v. Wisconsin, 582 U.S. 383, 393 (2017), under the "flexible test developed in Penn Central," Cedar Point, 594 U.S. at 148. The Penn Central test balances "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." Cedar Point, 594 U.S. at 148 (citing Penn Cent., 438 U.S. at 124). As the Supreme Court most recently explained, "[a] use restriction that is 'reasonably necessary to the effectuation of a substantial government purpose' is not a taking unless it saps too much of

the property's value or frustrates the owner's investment-backed expectations." Sheetz v. County of El Dorado, 601 U.S. 267, 274 (2024) (quoting Penn Cent., 438 U.S. at 127).

B.

Here, plaintiffs argue that the charity care program resulted in a "per se" taking during the years for which they seek relief. Plaintiffs asserted at oral argument that N.J.S.A. 26:2H-18.64, which they refer to as the

> "Take-All-Comers Statute" is a physical taking. It requires the hospital to take its own property and use it in a particular way. The statute is not a restriction on the use of the property. It requires the actual taking and transferring to other people the property of the hospital . . . for example, medications or IV fluids. It includes other medical supplies; it includes the facilities of the hospital; it includes the property interest in the people that are working there, who are providing these services.

We consider in turn each of the categories of property plaintiffs allege have been subject to a taking -- supplies, services, and facilities -- to determine whether a "per se" taking has occurred. We therefore analyze plaintiffs' claims to determine whether charity care involves the government physically taking a hospital's real or personal property, whether for itself or a third party -- an inquiry relevant to the hospitals' claims that supplies and services have been taken -- or whether it causes physical occupation of private property -- an

20

inquiry relevant to the claim that charity care constitutes a taking of the hospitals' facilities.[2]

## 1.

### a.

We first consider whether the use of medical supplies in the course of providing charity care is tantamount to the government physically acquiring hospitals' property for public use. We find that it is not.

The program here is distinguishable from Horne v. Department of Agriculture, in which the U.S. Supreme Court held that an order requiring a certain percentage of a raisin crop to be physically set aside for the government "free of charge" was an unconstitutional taking. 576 U.S. 351, 354, 361, 364-65 (2015). In explaining how the order was "a clear physical taking," the Court stated that "[a]ctual raisins are transferred from the growers

---

[2]  The hospitals do not argue that the charity care program deprives them of "all economically beneficial use" of their property, see Lucas, 505 U.S. at 1015, and, indeed, it does not:  they continue to treat insured patients and receive subsidies for providing charity care.

We recognize that some cases group use restrictions that culminate in the loss of all economically beneficial use of a property as a regulatory taking. See Horne v. Dep't of Agric., 576 U.S. 351, 361 (2015); Sheetz, 601 U.S. at 274; Palazzolo, 533 U.S. at 617.  But because Lucas refers to such a taking as "categorical," 505 U.S. at 1015; see also Lingle, 544 U.S. at 538, we address it in the context of "per se" takings.

21

to the Government. Title to the raisins passes to the Raisin Committee. The Committee's raisins must be physically segregated from free-tonnage raisins. Reserve raisins are sometimes left on the premises of handlers, but they are held 'for the account' of the Government." Id. at 361 (citations omitted). According to the opinion, "[t]he Government then sells, allocates, or otherwise disposes of the raisins in ways it determines are best suited to maintaining an orderly market." Id. at 354. The Raisin Committee sometimes sells the raisins "in noncompetitive markets, for example to exporters, federal agencies, or foreign governments; donates them to charitable causes; releases them to growers who agree to reduce their raisin production; or disposes of them by 'any other means' consistent with the purposes of the raisin program," all in the discretion of the Raisin Committee. Id. at 355.

In contrast to the Raisin Marketing Order at issue in Horne, the charity care program does not require hospitals to "physically set aside" any portion of their property for either the government or for qualified indigent patients. The statute and regulation are not written from the perspective of obtaining certain real or personal property, and no transfer of title or ownership occurs. If plaintiffs were required to hand over boxes of bandages or to surrender medical devices to the government or a third party, which could then sell or

22

dispose of those bandages or devices at will, this case would fall neatly into Horne's analysis.

Instead, the charity care program prevents hospitals from denying admission or appropriate services to patients because of their inability to pay and from billing patients eligible for charity care. See N.J.S.A. 26:2H-18.64; N.J.A.C. 10:52-11.4. A hospital retains both ownership and control of its own facilities and equipment, and it makes choices about the allocation of those resources based on its assessment of patient needs. Contrast Horne, 576 U.S. at 360 (explaining that "depriving the owner of 'the rights to possess, use and dispose of' the property," whether personal or real, "'is perhaps the most serious form of invasion of an owner's property interests'" (quoting Loretto, 458 U.S. at 435)).

As to consumables like medications, bandages, and other single-use or exhaustible items supplied in conjunction with providing treatment as required by the charity care program, we do not make light of their cost. But the provision of such consumables incidental to compelled medical care is, in our view, not the same as the compelled cession of property that retains its economic value and can be sold or disposed of at the transferee's discretion. If a hospital provides pain medication or applies a cast on a broken bone, patients have not taken possession or been transferred ownership of those supplies in

23

the same way the government took possession of the raisins in Horne. See 576 U.S. at 361-62.

The hospitals argue that the medical supplies they use in treating patients are their property just as the raisins were the property of the growers in Horne, and we do not disagree. But Justice Oliver Wendell Holmes noted that "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pa. Coal Co. v. Mahon, 260 U.S. 393, 413 (1922); accord Penn Cent., 438 U.S. at 124 (quoting Mahon and explaining that the Court "has accordingly recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values").

In our view, that reasoning holds true for the incidental consumption of medical supplies, furnished in accordance with the hospitals' own determinations of what supplies are needed and how they should be used, while providing care. Thus, we reject the notion that the charity care program specifically constitutes a "per se" taking by requiring hospitals to treat patients whose care may entail the use of items from the hospitals' inventory, such as "medications, intravenous solutions, bandages, food, . . . [and] medical devices such as surgical implants."

24

b.

We reach a similar conclusion as to the services offered in the course of providing mandated charity care. Plaintiffs rightly note that this Court determined, in considering a challenge to the assignment by municipal courts of attorneys to represent defendants unable to pay for counsel, that although "some cases . . . question whether a lawyer's services are 'property' within the constitutional protections involved[,] we believe that they are." Madden v. Township of Delran, 126 N.J. 591, 602 (1992). Although the Madden Court expressed concern about the burden created by assigned pro bono representation and took administrative steps to reduce that burden, the Court ultimately -- and leaving open the question of its authority to do so -- declined to "order government to pay attorneys who are assigned by the municipal court to represent defendants too poor to pay for counsel." Id. at 594. It did so relying in part on State v. Rush, 46 N.J. 399 (1966).

In Rush, we held that assigning counsel "to defend indigents charged with crime" did not violate constitutional provisions including the Takings Clause. Id. at 402, 408. The Rush Court stated that "[n]one of [the constitutional] contentions [raised by the plaintiffs challenging mandatory pro bono representation] is new, and if one accepts the premise that the duty to defend the poor is a professional obligation rationally incidental to the right

25

accorded a small segment of the citizenry to practice law, these claims fall away." Id. at 408. The Court did determine, however, that "in fairness," as an "important policy issue," "the bar alone should [not] be required to discharge a duty which constitutionally is the burden of the State." Id. at 402, 408-09. To address that unfairness, the Court "suggest[ed] compensation at 60% of the fee a client of ordinary means would pay an attorney of modest financial success." Id. at 413. The Court explained that the members of the bar would share in the burden as taxpayers but also "for the time being at least . . . should contribute something more." Ibid.

Like the Court found with respect to unpaid attorney assignments in Rush, and given both the nature of the medical profession and its long tradition of providing care to those in need without regard to their ability to pay, we find unavailing the argument that charity care constitutes a taking as to services furnished by the hospitals. That said, just as we held it unfair -- though not unconstitutional -- to require attorneys to bear the entirety of the burden of serving indigent clients in Rush, we do not suggest it is fair for medical professionals and hospitals to bear, alone, the cost of providing services to those who cannot pay for them. But, in contrast to administration of the legal field, over which our State Constitution grants this Court exclusive jurisdiction, N.J. Const. art. VI, § 2, ¶ 3, we have no authority to propose, as a

26

matter of policy, what a fair-though-not-constitutionally-mandated ratio of burden-bearing would be with respect to hospital services. That question is for the Legislature, and its response to that question appears in the charity care subsidization formula it adopted; if that response is not sufficient, in the hospitals' view, potential redress lies with the Legislature.

2.

Finally, as to the hospitals' claim that charity care constitutes a taking of their facilities, we find that charity care does not constitute an unconstitutional physical invasion or occupation of private property.

Charity care imposes no right to take access to the hospitals, which are in the business of generally providing medical care to patients and are open to the public. The charity care program does not, as the trial judge aptly stated in his written opinion, "instill . . . property right[s] in patients to traverse [plaintiffs'] property at will." Any use of the hospitals' facilities in treating charity care patients is not the specific objective or mandate of the program, but rather is incidental to the hospitals' determination of how to provide the care the program requires. As with the supplies, which are distinguishable from the raisins in Horne in part because the hospitals determine when and how to use them, the hospitals use and allow access to their facilities in

providing charity care according to their own determinations of patients' needs.

Charity care is thus distinguishable from circumstances in which the U.S. Supreme Court has found a physical taking by invasion or occupation. In Cedar Point, the Court held that a regulation granting labor organizers a "right to take access" to the property of an agricultural employer for three hours a day, up to 120 days a year, was a "per se" taking. 594 U.S. at 143, 152. And in Nollan v. California Coastal Commission, the Court held that a permit condition requiring private property owners to grant the public an easement across their beachfront property was an unconstitutional taking as a permanent physical occupation. 483 U.S. 825, 828, 832 (1987). Unlike the regulation at issue in Cedar Point and the permit condition in Nollan, however, charity care only limits hospitals' right to exclude and ability to bill patients who cannot pay for treatment; it does not involve an affirmative "right of access" that would allow any individual to physically invade or occupy the hospital.

Further, in contrast to the properties at issue in Cedar Point and Nollan, hospitals, even when privately owned, are open to the public. In Cedar Point, the Court recognized that "[l]imitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." 594

28

U.S. at 157. It is on that basis that the Court distinguished the takings at issue in Cedar Point, Horne, and Nollan from the state constitutional provision challenged in PruneYard Shopping Center v. Robins, 447 U.S. 74, 77 (1980).

In PruneYard, the Court held that requiring the owners of "a privately owned shopping center to which the public is invited" to allow high school students "to exercise state-protected rights of free expression and petition on shopping center property" by distributing leaflets "clearly does not amount to an unconstitutional infringement of [the owners'] property rights under the Taking Clause." 447 U.S. at 76-78, 84. It reached that conclusion after analyzing the alleged taking as a regulatory, rather than a per se, taking. See id. at 83. The Court did so even though "one of the essential sticks in the bundle of property rights is the right to exclude others. And here there has literally been a 'taking' of that right . . . ." Id. at 82. The Court explained that "it is well established that 'not every destruction or injury to property by governmental action has been held to be a "taking" in the constitutional sense.'" Ibid. (quoting Armstrong v. United States, 364 U.S. 40, 48 (1960)). PruneYard thus makes clear that, although a property owner has a right to exclude, not every government infringement on that right is a taking requiring just compensation. We find that language instructive and more applicable to

29

plaintiffs' challenge here than the holdings in <u>Cedar Point</u> and <u>Nollan</u>, which involved invasions of property not otherwise open to the public.

In sum, we find that charity care does not amount to a per se taking as to any of the property listed by plaintiffs. The program does not work a physical invasion of hospital facilities or a physical appropriation of hospital supplies and materials under controlling U.S. Supreme Court case law, and it does not constitute a taking of the services provided, despite this Court's recognition of professional services as a form of "property" in <u>Madden</u>, for the reasons extrapolated from <u>Rush</u>.

Because charity care does not involve the appropriation of a hospital's private property under any of the "per se" takings categories, we consider whether the program effects a regulatory taking.

C.

To determine whether charity care constitutes the kind of regulatory taking that does not deprive the owner of all economically beneficial use, we consider, essentially, whether the manner in which it restricts the hospitals' use of their property goes "too far." <u>See</u> <u>Mahon</u>, 260 U.S. at 415 ("The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). We hold that it does not. Although charity care prohibits hospitals from turning away

30

qualified patients solely on the basis of their inability to pay for health care, it is not an unconstitutional "regulatory" taking under the balancing test announced in Penn Central because the highly regulated nature of the hospital industry and the paramount public interest it serves outweigh the program's adverse economic impact on the hospitals.

### 1.

As to the first Penn Central factor -- the economic impact of the regulation -- the Appellate Division recognized that plaintiffs had "clearly established . . . evidence sufficient to support a finding that [charity care] has had an adverse impact on their profitability." Englewood Hosp. & Med. Ctr., 478 N.J. Super. at 647. But the court concluded that such an adverse economic impact was "not dispositive." Ibid. We agree with the appellate court's conclusion. Although plaintiffs have demonstrated an adverse economic impact, that alone does not mean that charity care amounts to a regulatory taking. We must also analyze the second and third factors.

### 2.

The second Penn Central factor -- whether the regulation has "interfered with distinct investment-backed expectations," 438 U.S. at 124 -- focuses on whether the restriction that causes the adverse economic impact of the first factor came as a surprise, a change that reasonable investors could not have

anticipated and therefore did not factor into their choice to invest. See, e.g.,

Holliday Amusement Co. of Charleston, Inc. v. South Carolina, 493 F.3d 404,

411 (4th Cir. 2007) (explaining that, "as the Supreme Court pointed out in

Lucas, [505 U.S. at 1027-28,] the owner of any form of personal property must

anticipate the possibility that new regulation might significantly affect the

value of his business. . . . This is all the more true in the case of a heavily

regulated and highly contentious activity such as video poker. The pendulum

of politics swings periodically between restriction and permission in such

matters, and prudent investors understand the risk."); Pharm. Care Mgmt.

Ass'n v. Rowe, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, J., concurring)

(explaining that pharmacy benefit managers (PBMs) "should . . . have

expected the possibility that they would have to disclose to their covered entity

customers information . . . . PBMs are undoubtedly aware of the heavily

regulated nature of the healthcare industry; in fact, as the district court noted,

they are already subject to extensive regulation under federal and state law. If

PBMs truly assumed that they would be free from disclosure requirements of

the sort set forth in the Maine law here, this would be more wishful thinking

than reasonable expectation.").

Here, plaintiffs operate in a highly regulated industry that has a long practice of providing charity care in some form. Thus, their "investment-backed expectations" are diminished.

It is undisputed that healthcare is a highly regulated industry, even beyond the elaborate regulations associated with charity care. For example, the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26, enacted in 1971, created a comprehensive system to regulate New Jersey health care facilities. To secure an operating license, change ownership, or make other significant changes, a hospital must apply for a Certificate of Need (CN). See N.J.S.A. 26:2H-5.8(c); N.J.A.C. 8:33-3.5. To obtain a CN, a hospital must commit "to provide services to medically underserved populations," N.J.A.C. 8:33-4.9(c), and describe how much charity care it will provide, id. at .10(a)(6). "[N]o certificate of need shall be granted to any facility that fails to comply with State and Federal laws regarding its obligation not to discriminate against low income persons, minorities, and disabled individuals." Id. at .9(c). Requirements like those reflect that, in New Jersey, hospitals are subject to long-standing, "extensive regulation in the public interest." Desai v. St. Barnabas Med. Ctr., 103 N.J. 79, 90 (1986). The Legislature's "extensive supervisory and regulatory control over hospital functions" demonstrates our "State's profound concern with public health care." Id. at 88.

33

In addition to state regulation, hospitals that participate in and receive payments from Medicare must opt into the Emergency Medical Treatment and Active Labor Act (EMTALA), which requires a hospital with an emergency department to provide "an appropriate medical screening examination" to anyone on whose behalf a request for examination or treatment is made and to either treat or transfer any individual the hospital determines to have "an emergency medical condition," regardless of their ability to pay, 42 U.S.C. § 1395dd; 42 C.F.R. § 489.24(a).  Similarly, hospitals seeking tax-exempt status must meet the care and billing requirements of the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, § 9007, 124 Stat. 119, 855 (2010); 26 U.S.C. § 501(r).

Participation in a heavily regulated industry lessens investment-backed expectations.  For example, in rejecting an as-applied takings claim to a hospital billing rate scheme by several employee benefit plans, the U.S. Court of Appeals for the Third Circuit held that the scheme did not "interfere[] with the plans' 'investment-backed expectations'" "given the historically heavy and constant regulation of health care in New Jersey."  United Wire, Metal & Mach. Health & Welfare Fund v. Morristown Mem'l Hosp., 995 F.2d 1179, 1188, 1191 (3d Cir. 1993).  Additionally, the U.S. Court of Appeals for the First Circuit held that Maine's "free care" law -- which created a program

34

similar to charity care that also prohibited hospitals from denying services based on ability to pay and provided reimbursement through its Medicaid program -- was not a taking. Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 123-24 (1st Cir. 2009). The court reasoned in part that a hospital's "investment-backed expectations are tempered by the fact that it operates in the highly regulated hospital industry." Id. at 128. We agree that, because hospitals operate in such a highly regulated industry, their investment-backed expectations, to the extent they exist in that context, see United Wire, 995 F.2d at 1191, are "tempered," Franklin Mem'l Hosp., 575 F.3d at 128.

Beyond the extensive regulation of the healthcare industry, we also find that the long tradition of providing medical care to indigent patients and the tax benefits that flow from such care further cut against the argument that the charity care program's requirements could frustrate reasonable investment-backed expectations.

It is axiomatic that a hospital "exercises its [healthcare] powers 'in trust,' 'for the benefit of the public,' and 'in aid of [its] service to the public.'" Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 68 (2024) (alterations in original) (quoting Berman v. Valley Hosp., 103 N.J. 100, 106 (1986)). "[T]his Court has continuously emphasized the important societal role hospitals play when enacting healthcare policies." Ibid. In that context,

"a hospital, in providing health-care services and facilities, is to be considered 'a quasi-public entity to serve the public.'" Berman, 103 N.J. at 106 (quoting Doe v. Bridgeton Hosp. Ass'n, Inc., 71 N.J. 478, 486 (1976)). Because they are quasi-public institutions, hospitals "must serve the public without discrimination." Doe, 71 N.J. at 487. Indeed, the "primary purpose" of a hospital is "to serve the public." Desai, 103 N.J. at 88 (quoting Belmar v. Cipolla, 96 N.J. 199, 208 (1984)).

As quasi-public entities, hospitals' investment-backed expectations as to charity care reimbursements are lessened because of the long-standing and well-known tradition of providing care to indigent patients. The essential attributes of the charity care program are not unexpected or new to the hospital industry. Although the current program was enacted in 1992, investors understand that well before then, it had been a practice for hospitals to provide care to low-income patients. Since 1847, the AMA ethics statement has explained that "[p]overty . . . should always be recognized as presenting [a] valid claim[] for gratuitous services." Am. Med. Ass'n, at 105-06. Investors know this. Indeed, "[t]he provision of charity care is a core function of a hospital." Kuchera, 221 N.J. at 254.

Additionally, hospitals derive tax benefits from their participation in charity care. Investors are certainly aware of those benefits when starting to

36

do business as a hospital, and those benefits are part of the exchange for providing services to the public, including services for indigent patients. First, nonprofit hospitals in New Jersey are exempt from state income, property, and sales taxes. See N.J. Const. art. VIII, § 1, ¶ 2 ("Exemption from taxation may be granted only by general laws."); N.J.S.A. 54:10A-3(e); N.J.S.A. 54:4-3.6; N.J.S.A. 54:32B-9(b). Nonprofit hospitals that comply with the requirements of 26 U.S.C. § 501(r) are exempt from federal income taxation as well. See 26 U.S.C. § 501(c)(3). The degree of charity care a hospital provides is a factor the Internal Revenue Service (IRS) may use when it determines if the hospital qualifies for 501(c)(3) tax-exempt status, and hospitals receive federal tax benefits in part "[t]o help offset the costs" of charity care. Cong. Rsch. Serv., Hospital Charity Care and Related Reporting Requirements Under Medicare and the Internal Revenue Code (June 18, 2018), https://sgp.fas.org/crs/misc/ IF10918.pdf. And for-profit hospitals can take tax deductions for charity care costs. Zachary Levinson et al., Hospital Charity Care: How it Works and Why it Matters, KFF (Nov. 3, 2022), https://www.kff.org/health-costs/issue-brief/hospital-charity-care-how-it-works-and-why-it-matters.

We note the tax benefits that accompany charity care not as part of any just compensation inquiry -- we do not reach the question of just compensation here -- but to underscore that such benefits, expressly tied to the provision of

37

charity care, demonstrate generalized awareness of charity care requirements and serve to temper any impact on reasonable investment-backed expectations.

In sum, a number of factors undermine any contention that the charity care program frustrates reasonable investment-backed expectations. The heavily regulated nature of the healthcare industry, the long-standing tradition of hospitals caring for indigent patients, and the existence of tax benefits specifically tied to such care all diminish expectations that hospitals might be free of charity care obligations. Thus, the second Penn Central factor weighs against finding a taking.

3.

The third Penn Central factor -- "the character of the governmental action," 438 U.S. at 124 -- strongly favors finding no unconstitutional "regulatory" taking. Importantly, a taking will rarely be found "when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent., 438 U.S. at 124 (citation omitted); see also Nebbia v. New York, 291 U.S. 502, 523 (1934) ("Equally fundamental with the private [property] right is that of the public to regulate it in the common interest."). Because charity care furthers the State's police power by promoting the general health and welfare of its citizens, see Lucas, 505 U.S. at 1027; furthers the legislatively declared

38

paramount public interest to guarantee equal access to health care, see N.J.S.A. 26:2H-18.51(a); and clearly "adjust[s] the benefits and burdens of economic life to promote the common good," Penn Cent., 438 U.S. at 124, factor three weighs heavily in the State's favor in concluding that the charity care program does not amount to an unconstitutional "regulatory" taking. Similarly, this Court held that regulations that required a nursing home as a condition of licensure "to make available a reasonable number of its beds to indigent persons" did not constitute a taking and explained that such regulations were "directed at an acute social problem affecting the health and welfare of the needy aged and infirm." In re Health Care Admin. Bd., 83 N.J. 67, 81 (1980).

Although the program's requirement that hospitals provide care regardless of ability to pay impacts hospitals financially, the character of the government action here must receive the greatest weight due to the importance of charity care in our State. In enacting the charity care program, the Legislature declared that "[i]t is of paramount public interest for the State to take all necessary and appropriate actions to ensure access to and the provision of high quality and cost-effective hospital care to its citizens." N.J.S.A. 26:2H-18.51(a) (emphasis added). As amici explain, charity care "provides bedrock access to health care for the state's lowest-income residents" and "is a core component of New Jersey's promise to its residents that basic health care

39

services will always be available." And as stated above and in detail in the discussion of factor two, providing charity care in New Jersey "is a core function of a hospital." Kuchera, 221 N.J. at 254.

The flexible Penn Central test aims to "strike[] a balance between property owners' rights and the government's authority to advance the common good." Murr, 582 U.S. at 408 (Roberts, C.J., dissenting). And here, on balance, the character of the government action providing for the common good outweighs any adverse economic impact and reasonable investment-backed expectations on the part of the hospitals. Accordingly, charity care does not go "too far" so as to become an unconstitutional "regulatory" taking requiring just compensation. Rather, it "adjust[s] the benefits and burdens of economic life to promote the common good," see Penn Central, 438 U.S. at 124, but it "leave[s] the core rights of property ownership intact," Franklin Mem'l Hosp., 575 F.3d at 129.

D.

Because we hold under the facts as presented in this case that charity care does not amount to a taking, there is no need to address just compensation. See Ruckelshaus, 467 U.S. at 1000-01.

V.

Finally, although we conclude that the charity care program is not an

40

unconstitutional taking, we recognize that the program <u>does include</u> subsidy payments for the hospitals' services. In an industry that is heavily regulated to begin with, investment-backed expectations recognize that as well. Hospitals are therefore entitled to subsidy payments as part of the program.

Some of the hospitals believe that the Legislature provided insufficient charity care subsidies during any given fiscal year. The charity care program has a mechanism to address such grievances: once the hospital-specific subsidies have been calculated, a hospital can challenge its subsidy allocation by, for example, filing an administrative appeal with the DOH, N.J.A.C. 10:52-13.4(f)(1) to (2), or seeking adjustment of the Medicaid rate issued annually by the Division, <u>id.</u> at -14.17(c).

As the First Circuit has stated, to the extent a hospital is dissatisfied with the subsidy it receives, or if it receives an amount below the base set by the Legislature, that dissatisfaction "is a dispute with the policy choices made by the state's political branches." <u>Franklin Mem'l Hosp.</u>, 575 F.3d at 130. On that note, the "better course of action is to seek redress through the state's political process" rather than under the Takings Clause. <u>See</u> <u>ibid.</u>

## VI.

The judgment of the Appellate Division is affirmed as modified.

41

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE FASCIALE's opinion.